IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
JUNE 14, 2005 Session

# IN THE MATTER OF: M.A.R., dob 3/26/99 and J.S.R., dob 7/16/99, Children Under 18 Years of Age

### Direct Appeal from the Juvenile Court for Knox County
No. 46917      Carey E. Garrett, Judge

### No. E2005-00255-COA-R3-PT - FILED AUGUST 11, 2005

This is a parental termination case. The parents' next door neighbors overheard the mother striking, cursing, and threatening her daughter over a baby monitor and recorded the incident. The tape also captured the father coming home from work and asking the mother about certain marks on the child. The neighbors subsequently turned the tape over to the Tennessee Department of Children's Services. The juvenile court placed the children in the protective custody of the department, and the department implemented a permanency plan requiring the mother and father, among other things, to undergo therapy. The department subsequently filed a petition in the juvenile court seeking to terminate the parents' parental rights. The juvenile court found that the department proved each ground alleged by clear and convincing evidence and that termination was in the children's best interest. We affirm.

### Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Juvenile Court Affirmed

ALAN E. HIGHERS, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and DAVID R. FARMER, J., joined.

Brandon K. Fisher, Clinton, TN, for Appellants

Paul G. Summers, Attorney General and Reporter, Jennifer L. Brenner, Assistant Attorney General, Nashville, TN, for Appellee

# OPINION

## I.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

M.A.R. (dob: 03/21/1999) and J.S.R. (dob: 07/16/1999) are the adopted children of Teresa Rice ("Mother") and Gregory Rice ("Father," or collectively with Mother, the "Appellants"). The Appellants originally served as the foster parents for the children. DCS placed J.S.R. with the Appellants in March of 2000 and placed M.A.R. with the Appellants in July of 2000. Both children are special needs children exhibiting developmental delays. When M.A.R. first came to live with the Appellants, she did not know how to chew, could barely walk, ate her own feces, exhibited evasive behavior, and she had previously been sexually assaulted. J.S.R.'s biological mother was a prostitute and drug user who abandoned J.S.R. in a "crack house." The Appellants ultimately adopted M.A.R. and J.S.R. in 2001.

Evelyn DeBusk and Daniel DeBusk (the "DeBusks") lived next door to the Appellants during the relevant period in question. On March 6, 2002, the DeBusks overheard an altercation over a baby monitor they purchased for their grandchildren and recorded the incident on an audiotape. On the tape, Mother is also heard questioning M.A.R. concerning a bathroom incident.[1] Over the course of approximately forty minutes, Mother is heard yelling at M.A.R. and repeatedly striking her with an object at different intervals, to which M.A.R. responded with profuse crying. During the course of the incident, Mother stated that she would stop hitting M.A.R. when M.A.R. told the truth, but Mother continued to strike M.A.R. even after M.A.R. responded to Mother's questions. Mother is heard instructing M.A.R. to move her hands so that she could continue to strike the child. At one point during the incident, Mother calls M.A.R. a "fucking bitch" and threatens to make M.A.R. take a bath in boiling water while filling up a pot with water. When Father returned home from work, the tape captured him stating that M.A.R. is "covered from here to here." In response to Father's comment, Mother stated that she did not abuse their children.

On March 7, 2002, law enforcement officers arrived at the Appellants' home to investigate a complaint of child abuse.[2] The officers made the Appellants disrobe M.A.R. and J.S.R. so they could inspect the children for signs of abuse, but they did not remove the children that evening. Thereafter, the DeBusks provided the Tennessee Department of Children's Services ("DCS") with a copy of the tape. Karen Lambeth ("Ms. Lambeth"), a Child Protective Services investigator with DCS, started an investigation into the incident on March 11, 2002. During the course of her investigation, Ms. Lambeth interviewed M.A.R. and J.S.R. During her interview with M.A.R.,

---

[1] At trial, the DeBusks identified the voices on the tape as those of Mother and M.A.R., and Mother conceded that the incident reflected on the tape captured the events occurring in her home on March 6, 2002.

[2] Although the record is not entirely clear, it appears that the DeBusks made the complaint to law enforcement officials.

M.A.R. stated that, during the incident on March 6, 2002, Mother hit her with a wooden spoon[3] and that "mommy is mean to me." Ms. Lambeth inspected M.A.R. the day she began her investigation, and, while she did notice some slight yellowish tint, she did not see any serious bruising. She also inspected J.S.R. and noted no bruising on his body either. Ms. Lambeth did not remove M.A.R. or J.S.R. from the Appellants' custody that day.

At the request of personnel at DCS, Mother and Father came to the DCS office to discuss the events captured on the audiotape. Once they arrived at the DCS office, Mother and Father were informed that the audiotape contained evidence of possible abuse. A DCS report generated on March 11, 2002, noted that, upon interviewing Mother, Mother stated that she was talking to her dog on the audiotape. The report also stated that M.A.R. and J.S.R. had not suffered physical or psychological harm as a result of the incident.

On March 14, 2002, DCS filed a Petition for Temporary Custody in the Juvenile Court of Knox County alleging that M.A.R. and J.S.R. were dependent and neglected. That same day, the juvenile court entered a Protective Custody Order placing the children in the temporary custody of DCS. On March 15, 2002, after the children were removed from the Appellants' custody, DCS had them examined by a doctor who noted the absence of any bruising.[4] Lisa Davis ("Ms. Davis"), a licensed clinical social worker, began therapy with M.A.R. and J.S.R. in March of 2002. During her sessions with the children, M.A.R. made references to specific incidents occurring in the Appellants' home. She referenced being put in a tub of hot water, being placed on the stove and burned, and stated that Father was not protective. Ms. Davis noted a lot of "bathroom issues" and a feeling of fear by the children regarding bathroom activity. When the children met with Mother and Father in Ms. Davis' presence, she noted that M.A.R. and J.S.R. appeared hesitant to interact with their parents and expressed fear. She did not see a lot of bonding between the family, and many times the children would refer to Appellants by their first names. When they discussed going back to live with Mother and Father, the children would express that they did not want to return. When she first began treating the children, Ms. Davis noted that they were suffering from post-traumatic stress disorder.

On April 1, 2002, DCS promulgated an initial permanency plan for both children which required Mother to do the following: (1) obtain a psychological evaluation as instructed by the juvenile court, (2) obtain a psychiatric evaluation, (3) follow the recommendations of the therapists until released from treatment, (4) sign all releases which would enable DCS to discuss and monitor Mother's progress with mental health professionals, (5) Mother would not participate in the children's counseling sessions unless the therapist deems it to be in the children's best interest, (6)

---

[3] At trial, Mother produced a plastic spatula which she vehemently asserted was the item she used to strike M.A.R.

[4] DCS filed an amended petition for temporary custody on March 22, 2002, which alleged that, on March 14, 2002, "dark black bruises" were observed on M.A.R.'s "bottom, lower back, back of her legs near her knees and on the inside of her thighs." The amended petition alleges that the "bruises were in the shape of a large wooden stirring spoon." The record contains no evidence supporting this allegation.

Mother would not interfere with the foster parents, (7) Mother would obtain all information regarding the children through DCS, (8) Mother would maintain contact with DCS and notify DCS of any lifestyle changes, (9) Mother would receive, at a minimum, 4.3 hours of visitation with the children each month, (10) Mother would forego contact with M.A.R. until approved by the juvenile court, (11) Mother would have supervised visitation with J.S.R., and (12) Mother would follow the visitation guidelines set by DCS. These initial permanency plans also set forth, in essence, the same requirements for Father with the exception that Father received supervised visitation with both children. This initial permanency plan set forth the dual goals of returning the children to the Appellants or relative placement.

Also in April of 2002, Mother and Father began therapy with Dr. Robert Wahler ("Dr. Wahler"), a licensed clinical psychologist, for which DCS paid. His initial assessment noted that Mother was a "take-charge person, strong-willed," while Father was "quite guarded" and "quite dependent on [Mother] for guidance." Dr. Wahler found Mother to be "quite intrusive" with Father and confrontational, and she tended to take the same approach with the children. During the course of the therapy, Dr. Wahler discovered that Mother had a personality trait which manifested itself in the form of "an entitlement on her part to be the person who would direct and influence whatever was happening." He hoped that, through therapy, he would help Mother better control this trait. Dr. Wahler felt that the incident on the audiotape represented an example of Mother losing her ability to control this personality trait.

In May of 2002, the Child Abuse Review Team ("CART") recommended that DCS begin the process to terminate Mother's and Father's parental rights. During the initial stages of therapy, Dr. Wahler remained a strong advocate for the return of M.A.R. and J.S.R. to Mother and Father, even expressing his strong disagreement with CART's assessment of the case. Early on, he felt that members of CART had lost their objectivity and held a bias against Mother and Father. The interactions between Mother and DCS during the initial stages of this case can best be described as antagonistic. Mother expressed her frustration that DCS employees would not return her phone calls regarding her children, and she believed that DCS was not keeping her informed about the children's situation. Employees at DCS expressed their frustration at Mother calling DCS every day and making unreasonable demands concerning the children's medical treatment or access to records, and the employees felt as though Mother was attempting to dictate the treatment of the children. In one instance, Mother called and scheduled a doctor's appointment for J.S.R. which DCS had to cancel when it determined that the visit was not necessary. In another instance, Mother requested pictures of the children in specific sizes, locations, and poses. DCS followed up on each request made by Mother, but they determined that her concerns or allegations about statements made by other DCS employees were inaccurate. DCS also reported that Mother would show up early to visits in order to see M.A.R. Dr. Wahler found that DCS's complaints regarding Mother's intrusiveness were consistent with the behavior he was seeing during his therapy sessions with Mother and Father. He noted that, even with objective employees of DCS, Mother continued to be confrontational. Despite what he characterized as minor infractions, Dr. Wahler continued to believe that he could help Mother and Father regain custody of their children.

On June 27, 2002, the juvenile court entered a Consent Decree which provided that "[t]he parties stipulate that no further proof will be introduced and that based upon the proof introduced in previous hearings, there is a factual basis upon which the court could find [M.A.R.] and [J.S.R.] to be dependent and neglected children." In this order, the juvenile court ordered Mother and Father to continue therapy with Dr. Wahler until he released them, and the court ratified the April 1, 2002, permanency plan but modified it to reflect the single goal of returning the children to their parents.

On February 14, 2003, DCS filed a petition with the juvenile court seeking a no-contact and restraining order against the Appellants following an incident involving the children's foster parents. The foster father alleged that, upon returning home from work one night, he observed a vehicle pull up to the front of his home. The vehicle subsequently left at a high rate of speed, and the foster father followed. He stated that he observed a male and a female in the vehicle and wrote down the tag number. The Appellants vehemently denied involvement in the incident. The juvenile court conducted a hearing on the matter and subsequently found that the Appellants were involved in the incident. The court entered an order terminating the Appellants' visitation with the children and found them in contempt of the court's prior order restricting contact with the children.

This event led Dr. Wahler to reassess his stance on Mother's progress in therapy. He determined that the incident constituted a "fatal flaw" in Mother's progression thus far, and he felt that she had "deceived" him during their previous therapy sessions. After the incident, Dr. Wahler recommended that all visitation cease, and he decided that he could no longer continue the therapeutic relationship. After the therapy with Dr. Wahler ended in February of 2003, Mother and Father did not begin treatment with another mental health professional until October of 2003. Mother and Father decided to stop therapy with their new therapist because they disagreed with her opinions, and they felt they were not benefitting from the therapy. In March of 2003, DCS implemented a new permanency plan which contained the same requirements for Mother and Father, but it contained the dual goals of returning custody of the children to the parents and adoption.

In November of 2003, Ms. Nancy Cate ("Ms. Cate"), a nurse at a medical facility which had previously treated the children, received a call from a female at the doctor's office where Mother worked at the time. The caller identified herself as Shirley Elder ("Ms. Elder"), a nurse practitioner at the office, and she requested a copy of the children's medical records. When the nurse called the office where Mother worked and asked for Ms. Elder, Mother told Ms. Elder that she had called and requested the records and asked her to cover for her. Mother denied representing herself as Ms. Elder, and she contended that, while she dialed the number, she handed the phone to Ms. Elder who requested the records for her. Ms. Cate stated that at no point during the conversation did anyone hand the phone to another individual. Ms. Elder denied Mother's version of the incident, and she stated that she called Ms. Cate and informed her that she did not request the records.

On March 26, 2004, DCS filed a petition to terminate the Appellants' parental rights to M.A.R. and J.S.R. In the petition, DCS alleged the following as grounds justifying the termination of the Appellants' parental rights: (1) Mother committed severe child abuse against M.A.R., (2) Father committed severe child abuse against M.A.R. by failing to protect her, (3) persistent

conditions, (4) substantial noncompliance with the permanency plans, and (5) both parents' incompetence to adequately parent the children. The juvenile court conducted several hearings over non-consecutive days spanning June 21, 2004, to October 5, 2004. On December 15, 2004, the juvenile court entered an order finding that DCS proved each ground for termination by clear and convincing evidence and that terminating the Appellants' parental rights was in the children's best interests.[5]

Mother and Father filed a timely appeal to this Court seeking review of, as we perceive it, the following issue:

(1)     Whether the trial court erred in finding that the Appellee proved, by clear and convincing evidence, the existence of each ground for terminating the Appellants' parental rights.

DCS, apparently in the interest of thoroughness, presented this Court with the following additional issue for review:

(2)     Whether the trial court erred in finding that terminating the Appellants' parental rights is in the children's best interests.

Finally, Wayne Wykoff ("Mr. Wykoff"), the guardian *ad litem* for the children, has also presented an issue for this Court's review:

(3)     Whether the guardian *ad litem* fees awarded by the juvenile court are in the nature of support and, therefore, are not dischargeable in bankruptcy under 11 U.S.C. § 523(a)(5).

For the reasons set forth more fully herein, we affirm the juvenile court's decision to terminate the parental rights of the Appellants. We do not reach the merits of the issue presented by the guardian *ad litem* as this court is without jurisdiction to entertain this issue.

## II.
### STANDARD OF REVIEW

"Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and the child involved 'severing forever all legal rights and obligations' of the parent." **Means v. Ashby**, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(*l*)(1) (2003)). Both the United States Constitution and the Tennessee Constitution recognize a parent's fundamental right to the care, custody, and control of his/her child. **Santosky v. Kramer**, 455 U.S. 745, 753 (1982); **Hawk v. Hawk**, 855 S.W.2d 573, 579 (Tenn. 1993). "However, this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." **In re Drinnon**, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing **Santosky**, 455 U.S. at 769).

---

[5] The trial court originally entered an order terminating the Appellants' parental rights on December 9, 2004. The court subsequently filed an amended order on December 15, 2004, which is identical in all respects to the original order except for the addition of the statement at the end of the order to the effect that "[t]he Court makes its findings herein based on very clear and convincing evidence."

"Termination proceedings in Tennessee are governed by statute." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). The legislature has set forth certain enumerated grounds which, if proven, will warrant the termination of parental rights. *See* Tenn. Code Ann. § 36-1-113(g) (2003). Under our statutory scheme, a trial court's decision to terminate a parent's parental rights to a minor child must be based upon a finding that the grounds for termination have been proven by clear and convincing evidence and that terminating parental rights to the minor child are in the child's best interest. Tenn. Code Ann. § 36-1-113(c) (2003). Clear and convincing evidence establishing the existence of any one of the statutorily enumerated grounds will support a decision to terminate a parent's parental rights. *See In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000). In the order terminating parental rights, the trial court must also make specific findings of fact and conclusions of law justifying its decision. Tenn. Code Ann. § 36-1-113(k) (2003); *see also In re M.J.B.*, 140 S.W.3d at 654.

The heightened standard of proof applied to parental termination proceedings ensures the unwarranted termination or interference with a parent's constitutionally protected rights regarding a minor child. *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). This Court has previously framed the clear and convincing evidence standard in the following terms:

> [A]lthough it does not require as much certainty as the "beyond a reasonable doubt" standard, the "clear and convincing evidence" standard is more exacting than the "preponderance of the evidence" standard. *O'Daniel v. Messier*, 905 S.W.2d 182, 188 (Tenn. App. 1995); *Brandon v. Wright*, 838 S.W.2d 532, 536 (Tenn. App. 1992). In order to be clear and convincing, evidence must eliminate any serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence. *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992); *O'Daniel v. Messier*, 905 S.W.2d at 188. Such evidence should produce in the fact-finder's mind a firm belief or conviction as to the truth of the allegations sought to be established. *O'Daniel v. Messier*, 905 S.W.2d at 188; *Wiltcher v. Bradley*, 708 S.W.2d 407, 411 (Tenn. App. 1985). In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is "highly probable" as opposed to merely "more probable" than not. *Lettner v. Plummer*, 559 S.W.2d 785, 787 (Tenn. 1977); *Goldsmith v. Roberts*, 622 S.W.2d 438, 441 (Tenn. App. 1981); *Brandon v. Wright*, 838 S.W.2d at 536.

*In re C.W.W.*, 37 S.W.3d at 474; *see also Scott v. Means*, 130 S.W.3d 48, 54–55 (Tenn. Ct. App. 2003).

In reviewing a trial court's decision to terminate the parental rights of parent to a minor child, this Court applies the following standard to a trial court's findings of fact:

Because of the heightened burden of proof required by Tenn. Code Ann. § 36-1-113(c)(1), we must adapt Tenn. R. App. P. 13(d)'s customary standard of review for cases of this sort. First, we must review the trial court's specific findings of fact *de novo* in accordance with Tenn. R. App. P. 13(d). Thus, each of the trial court's specific factual findings will be presumed to be correct unless the evidence preponderates otherwise. Second, we must determine whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements required to terminate a biological parent's parental rights. *Jones v. Garrett*, 92 S.W.3d at 838; *In re Valentine*, 79 S.W.3d at 548-49; *In re Adoption of Muir*, 2003 Tenn. App. LEXIS 831, 2003 WL 22794524, at *2; *In re Z.J.S.*, 2003 Tenn. App. LEXIS 415, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *10 (Tenn. Ct. App. June 3, 2003) (No Tenn. R. App. P. 11 application filed); *Ray v. Ray*, 83 S.W.3d at 733; *In re L.S.W.*, 2001 Tenn. App. LEXIS 659, No. M2000-01935-COA-R3-JV, 2001 WL 1013079, at *5 (Tenn. Ct. App. Sept. 6, 2001), *perm. app. denied* (Tenn. Dec. 27, 2001).

*In re M.J.B.*, 140 S.W.3d at 654. "We review all issues of law *de novo* upon the record with no presumption of correctness." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Due to the gravity of their consequences, proceedings to terminate parental rights require individualized decision making. *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999). To that end, we are mindful that in cases of this nature a significant portion of the proof presented at trial consists of testimonial evidence. As such, we must also take account of the following principle which guides our review of a trial court's findings of fact:

> Unlike appellate courts, trial courts are able to observe witnesses as they testify and to assess their demeanor, which best situates trial judges to evaluate witness credibility. *See State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990); *Bowman v. Bowman*, 836 S.W.2d 563, 566 (Tenn. Ct. App. 1991). Thus, trial courts are in the most favorable position to resolve factual disputes hinging on credibility determinations. *See Tenn-Tex Properties v. Brownell-Electro, Inc.*, 778 S.W.2d 423, 425-26 (Tenn. 1989); *Mitchell v. Archibald*, 971 S.W.2d 25, 29 (Tenn. Ct. App. 1998). Accordingly, appellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary. *See Humphrey v. David Witherspoon, Inc.*, 734 S.W.2d 315, 315-16 (Tenn. 1987); *Bingham v. Dyersburg Fabrics. Co.*, *Inc.*, 567 S.W.2d 169, 170 (Tenn. 1978).

*Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

## III.
### LAW AND ANALYSIS

### *A.*
### *Grounds for Termination*

The Appellants seek to attack the sufficiency of the evidence regarding each ground alleged by DCS for terminating their parental rights. We begin by examining their assertion that DCS failed clearly and convincingly to prove that the conditions which led to the children's removal still persisted at the time of trial. "Persistent conditions," as this ground is commonly referred to, will provide a basis for terminating a parent's parental rights when:

> (3)(A) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>> (i) The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist:
>> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
>> (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3)(A) (2003). The children were removed from the Appellants' custody on March 14, 2002, by order of the juvenile court, and they have remained in DCS custody since that time. Accordingly, whether the children have been removed from the Appellants' home for more than six (6) months is not at issue. Instead, the Appellants attempt to demonstrate that the record does not support the conclusion that the conditions which led to the children's removal still persist.

In its brief, DCS concedes that, as to Mother, the condition which led to the children's removal was the audiotaped incident which it argues documented Mother's inability to control her anger.[6] DCS asserts that its goal was to provide Mother with psychological counseling in an effort

---

[6] The Appellants correctly noted in their brief that the juvenile court's order terminating their parental rights does not specifically identify Mother's anger as the condition which led to removal, therefore, they must assume that the
(continued...)

to enable her to remedy those personality traits (*i.e.*, anger management issues) which led to the events on the tape. As the party filing the petition to terminate the parental rights of the Appellants, DCS carried the burden of proving that Mother had not learned to control her anger. ***In re Valentine***, 79 S.W.3d 539, 549–50 (Tenn. 2002).

At trial, Mother admitted that the taped incident evidenced a problem with her ability to control her anger. She testified that her conduct that day was "totally wrong" and that she "lost [her] temper." She stated that her anger was directed toward Father for his lack of support, and the incident represented the culmination of stress from a new job, her having the flu, and the stress in the home. While she denied physically abusing the children, Mother testified that her conduct that day did amount to psychological abuse. She readily admitted that M.A.R. was "extremely intimidated" on the date of the incident. Mother testified that, due to the abuse which the children sustained prior to coming to the Appellants' home, she knew that she was not to use physical punishment in the home because it would be detrimental to the children. Despite these admissions at trial, Mother stated that she presently has her anger under control.

In April of 2004, approximately ninety (90) days before the trial, Mother and Father met with Dr. Edgar Jessee ("Dr. Jessee"), a licensed clinical psychologist. In support of the conclusion drawn by Mother at trial regarding her anger, she directs our attention to the testimony offered by Dr. Jessee as proof that the anger expressed by Mother which led to the children's removal no longer exists. Dr. Jessee stated that, while Mother exhibited anger on the tape which he described as "explosive" and "impulsive," he has not observed any such behavior in his most recent therapy sessions with Mother. Dr. Jessee felt that he was in a better position to make this determination since his interaction with Mother was closer to the trial than Dr. Wahler's sessions. Mother also directs our attention to the testimony offered by Dr. Wahler. Dr. Wahler stated that, since he had not seen the Appellants in over sixteen (16) months, the information regarding their psychological status is stale, and he has no knowledge as to whether the condition which led to the removal of the children still exists. He agreed that a therapist currently working with a patient is in a better position to give an opinion as to their current mental status. Despite this testimony, the juvenile court discounted the testimony of Dr. Jessee and found that there was clear and convincing evidence that Mother's original conduct continued to persist. Specifically, the court held that Mother had simply "gone through the motions" and "made no real effort" toward changing her behavior. We agree.

Dr. Wahler worked with Mother during the course of their fifty (50) to sixty (60) sessions. He testified that, during the initial stages of therapy, Mother appeared willing to work on her anger problem. Although he noted a series of minor infractions during therapy, he continued to believe that the therapy was working. It was not until the juvenile court found the Appellants in contempt for the incident at the foster parents' home that he "felt [he had] been deceived" by Mother. After the incident with the foster parents, Dr. Wahler concluded that Mother had not been making an

---

[6](...continued)
events on the tape constitute such condition. Even if DCS had not conceded this point in its brief, we find ample evidence in the record to place the Appellants on notice of the conditions which led to the removal of their children.

honest effort toward changing her behavior and terminated the therapy. The Appellants' sessions with Dr. Wahler ended in February of 2003, and they did not seek therapy again until October 2003. They stopped attending therapy with the new therapist because they disagreed with her opinions and did not feel that they were benefitting from the sessions. They did not begin therapy with Dr. Jessee until April of 2004, after the petition to terminate their parental rights had been filed.

Our review of Dr. Jessee's testimony, however, leads us to conclude that the juvenile court's decision to discount his testimony is well-founded. Dr. Jessee testified that he has only seen Mother approximately seven times for forty-five minute sessions each time. We find the following testimony by Dr. Jessee to be instructive on this issue:

> Q. Have you had enough of — enough interaction with her to be able to express an opinion as to her ability to parent and/or if the conduct that led to the removal of these children would happen again?
>
> A. *Not conclusively*. What I can say is this: First of all, *I can't comment on her ability to parent because I've never seen her in that context*.
>
> Q. You've not — have not met the children? You've never seen the children?
>
> A. Right.
>
> . . . .
>
> Q. Is that something you feel like that you need to give a more full opinion, is to — to see them with these children?
>
> A. Certainly that would help me give a more full opinion.
>
> Q. Okay. Can [Mother] be fixed in a short time, if I can use that word fixed?
>
> A. Well, I don't know that you can. Again, in order to adequately assess things *you need more time*. I think this business is not really about fixing people. It's about making changes and therapeutic gains. And they didn't come to me just to fix a problem of being angry, so I haven't looked at it in that —
>
> Q. Right.
>
> A. — framework. I don't know that she's not fixed now in terms of that problem. I don't know as, again, I have seen no evidence of that being a problem. So I'm not sure of that, beyond that how to answer your question.
>
> Q. I think I was more — therapy is — with [Mother] would be more of a long-term thing as opposed to a short-term thing is that what I —
>
> A. Yes, I think so.
>
> . . . .

Q. But if I understand right now the only opinion that you have any — any type of conclusivity [sic] with is that she appears to be able to manage the anger?

A. That *appears* to be the case.

. . . .

Q. So you're saying your statements about her being able to control her anger are conclusive within a reasonable degree of psychological certainty?

A. I'm a little uncomfortable with the words you use there, but I would say I — I would trust that, her ability to manage that. That's why I said earlier I'd be comfortable working with them. I don't think there's a great risk of her losing control with these kids now. That's my opinion *at this point*. *Might it change over time? It's possible*.

. . . .

Q. Right. This anger and losing control, the levels of anger that would make somebody go off like on that tape, is that typically a one-time thing or something that happens more than one time?

A. It's hard to say. *Typically it would be more than one time*.

(emphasis added). Dr. Wahler's testimony reinforces the premise that Dr. Jessee is not currently able to conclusively demonstrate that Mother has remedied her anger management issues. Dr. Wahler agreed that it takes time to properly assess an individuals' progress with therapy, and he feels that it would be premature for Dr. Jessee to offer a definitive conclusion due to his limited involvement with Mother. In his opinion, Dr. Jessee would need approximately three to six months in order to make a proper assessment of Mother's progress.

The events transpiring both before and after DCS filed the petition to terminate the Appellants' parental rights further demonstrate how Mother's inability to control those personality traits which led to the removal of the children has persisted throughout the case. While there were failures to communicate on the part of both DCS and the Appellants, numerous witnesses testified that, throughout the process of attempting to work with the Appellants, Mother continued to call DCS employees and make unreasonable demands. Dr. Wahler noted that, while he believed that some employees at DCS were antagonistic and expressed a bias toward Mother, Mother exhibited a confrontational attitude toward those employees at DCS who did remain objective. The juvenile court concluded that "[a]ll of [Mother's] conduct with D.C.S. confirms Dr. Wahler's opinion and testimony" and amounted to an effort by Mother to control and manipulate the process. The record supports this finding.

The statute also provides that the juvenile court could properly consider "other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect." Tenn. Code Ann. § 36-1-113(g)(3)(A) (2003). In February of 2003, the juvenile court found Mother

-12-

and Father in contempt after it determined that they had visited the home of the foster parents in violation of the court's order. While Mother and Father vehemently denied they did so, the Appellants never appealed the validity of the juvenile court's ruling in that regard. Ms. Cate and Ms. Elder both testified concerning Mother's attempt to obtain the children's medical records by impersonating Ms. Elder in November of 2003, prior to the petition for termination being filed. Mother offered a different version of the events and denied impersonating Ms. Elder. At trial, Ms. Elder also conveyed to the court a recent conversation she had with Mother. Mother called to make an appointment with one of the doctors and asked Ms. Elder if she would testify on her behalf. Mother asked Ms. Elder to testify that she told Mother to call and get the records and handed Ms. Elder the phone. Ms. Elder testified that Mother called her cell phone the night before she was to testify and left a message saying she needed to talk to her.

Ms. Elder also testified that Mother came to the office one morning with her mother and had numerous bruises, scrapes, and abrasions. Mother told Ms. Elder that she had fallen up the steps leaving work the night before. Ms. Elder did not think Mother's explanation was credible because of events she observed the previous night. Ms. Elder stated that, when she was talking to Mother in the parking lot the night before, she observed Mother go up the steps to her car and observed Mother drive away waving at them. Moreover, Ms. Elder, in her experience as a nurse practitioner, did not find Mother's injuries consistent with falling up steps. Mother and Father denied that Father assaulted her or otherwise caused the injuries, and both testified that Mother fell on the steps at work causing her injuries.

Julia Taylor ("Ms. Taylor"), office supervisor at the doctor's office where Mother worked, testified concerning Mother's illegal behavior after the petition to terminate her parental rights was filed in this case. On August 5, 2004, the office received a call from a local pharmacy wanting to confirm a prescription called in for Mother. An investigation into the matter revealed that Mother had been calling in prescriptions for herself, Father, and her mother using the names of doctors at the office. Ms. Taylor was able to determine that Mother had been engaging in this conduct for over a year, including 2003 when Mother was working toward reuniting with the children. As a result of this conduct, Ms. Taylor terminated Mother's employment. When Ms. Taylor confronted Mother with the evidence and terminated her employment, she testified that Mother simply said "okay" and that she "deserved it."

Turning to Father, Dr. Wahler noted that, during his initial sessions with Mother and Father, Father was "quite guarded," appeared to be "very accommodating" toward Mother, and he was "quite dependent on [Mother] for guidance." Dr. Jessee testified that, in his opinion, Father is now able to adequately protect the children from Mother. However, Dr. Jessee has only spoken with Father twice. In Dr. Wahler's opinion, Father "is not up to the challenge of really moderating [Mother's] style."

The following testimony offered by Father at trial supports the position of Dr. Wahler over that of Dr. Jessee:

Q. Now, Mr. Rice, you have listened to this tape that has been played in the court, haven't you?

A. Yes.

. . . .

Q. Now, on that tape you clearly hear you asking her about, what is this, the child is covered from here to here. Can you tell us what you're referring to?

A. I was referring to some abrasions that [M.A.R.] had on her elbow, hip and her lower calf — or shoulder, that is; her hip, thigh area, and lower calf.

Q. And were you implying that they had been caused by [Mother]?

A. No.

Q. Well, if you were not implying that they had been caused by [Mother], why would [Mother] respond to you, I do not beat our children?

A. I have no idea.

. . . .

Q. Have you ever done anything as a result of your counseling with Dr. Wahler to try to control your wife's behavior in regard to these children and her trying to pose [sic] herself on their treatment and —

A. The only thing my wife is guilty of is being proactive, sir.

Q. Do you think it's being proactive to — strike that. Basically you don't think there was any abuse as a result of that incident that was recorded; is that correct?

A. Correct.

. . . .

Q. You didn't think there was any need to protect them from your wife?

A. No, sir.

. . . .

Q. After you listened to those tapes and you told Mr. Wykoff that it caused you some concern, what did you do about it as far as your relationship with your wife?

A. It was discussed between my wife and I.

Q. When was it discussed?

A. After hearing it.

Q. What did you decide to do as a result of having heard those tapes and having the discussion with your wife?

A. I decided to stand beside my wife.

Father's testimony supports Dr. Wahler's conclusion that, at the time of trial, Father continued to exhibit the conduct which initially led to the removal of the children.

Each of the aforementioned episodes demonstrate that DCS has clearly and convincingly proven each of the requirements for persistent conditions found in section 36-1-113(g)(3)(A) of the Tennessee Code. The juvenile court found the explanations for the aforementioned events offered by Mother and Father at trial to be totally without merit. Moreover, the juvenile court made the following observation in the order concerning Mother's and Father's testimony:

> The testimony of [Mother] is found to be **without any credibility**. Not only did she commit perjury in the Courts [sic] opinion, she attempted to get other witnesses to lie for her. She pretended to cry during her testimony but also upon close observation the Court did not see one tear. [Father] had frequent memory losses, which certainly affects his credibility.

(emphasis added). Upon reviewing the record, we find no clear and convincing evidence to warrant a finding contrary to the trial court's credibility determinations. *See Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999). Accordingly, we affirm the juvenile court's decision regarding this ground for termination. As such, we need not address whether the record contains clear and convincing evidence of the other grounds for termination alleged by DCS. *See In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000).

### B.
### Best Interest of the Children

After concluding that DCS has proven one of the grounds for termination by clear and convincing evidence, the juvenile court also concluded that terminating the Appellants' parental rights would be in the best interest of M.A.R. and J.S.R. *See* Tenn. Code Ann. § 36-1-113(c)(2) (2003). The Appellants have not raised, as a separate issue, whether the juvenile court erred in making this subsequent determination. DCS, apparently in the interest of thoroughness, has raised the issue for our review, therefore, we will examine the juvenile court's decision in this regard to ascertain whether it is supported by the record.

The legislature has provided a list of factors which the trial courts of this state must consider when determining whether terminating a parent's parental rights will be in a child's best interest. *See* Tenn. Code Ann. § 36-1-113(i) (2003). This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child. *See State v. T.S.W.*, No. M2001-01735-COA-R3-JV, 2002 Tenn. App. LEXIS 340, at *9 (Tenn. Ct. App. May 10, 2002).

-15-

As previously noted, the record reveals that both Mother and Father have failed to make a lasting adjustment of circumstances, conduct, or conditions so as to make it safe to return the children to their custody. *See* Tenn. Code Ann. § 36-1-113(i)(1) (2003). Based on the duration of their conduct over the course of this case and their testimony at trial, it does not appear that a lasting adjustment will occur at any time in the near future. *See* Tenn. Code Ann. § 36-1-113(i)(2) (2003). The record also establishes that the children have not formed a meaningful relationship with Mother and Father. *See* Tenn. Code Ann. § 36-1-113(i)(4) (2003). The children were removed from the Appellants' home shortly after they were adopted. Ms. Davis testified concerning the children's fear and reluctance to interact with Mother and Father during visits. The evidence presented at trial demonstrates that a change in caretakers at this stage would have a detrimental effect on the children's emotional and psychological condition. *See* Tenn. Code Ann. § 36-1-113(i)(5) (2003). Specifically, Ms. Davis testified that, when the children first came to her for treatment, they were suffering from post traumatic stress disorder. She stated that, since being placed with the foster parents, the children have begun to thrive and no longer suffer from the disorder. The audiotape and Mother's failure to adequately address her personality deficits establishes Mother's propensity to inflict brutality and physical abuse on the children. *See* Tenn. Code Ann. § 36-1-113(i)(6) (2003). As previously discussed, Mother's and Father's current mental and/or emotional status would prove detrimental to the children if they were returned to the Appellants' custody. *See* Tenn. Code Ann. § 36-1-113(i)(8) (2003). Accordingly, we find that the record supports the trial court's ruling that terminating the Appellants' parental rights is in the best interest of these children.

## C.
### *Guardian Ad Litem Fees*

In the final order, the juvenile court ordered the Appellants to pay the guardian *ad litem* fees as set by the court. Shortly after the juvenile court issued the order, the Appellants filed a chapter 7 bankruptcy petition in federal court. The guardian *ad litem* requests that this Court issue a ruling to the effect that the guardian *ad litem* fees awarded by the juvenile court are in the nature of support and not dischargeable under 11 U.S.C. § 523(a)(5) of the federal bankruptcy code. We are without jurisdiction to entertain this issue.

The federal bankruptcy statute at issue provides that a discharge under chapter 7 of the bankruptcy code will not discharge an individual debtor of a debt owed:

> (5) to a . . . child of the debtor, for . . . support of such . . . child, in connection with [an] . . . order of a court of record, determination made in accordance with State or territorial law by a governmental unit, . . . but not to the extent that —
> . . . .
> (B) such debt includes a liability designated as . . . support, unless such liability is actually in the nature of . . . support.

11 U.S.C. § 523(a)(5) (2003). The guardian *ad litem* has strategically requested this Court to issue a ruling on this issue due to the nature in which the federal bankruptcy courts apply § 523(a)(5):

> Yet, while it is clear that ***Congress intended that federal not state law should control the determination of when an assumption of joint debts is "in the nature of" alimony or support***, it does not necessarily follow that state law must be ignored completely. It is unlikely that Congress could have intended such a result. The underlying obligation to provide support in the first place is necessarily determined by state law. The federal bankruptcy courts are obviously not empowered to create an obligation to support where it did not previously exist. Moreover, there is "no federal law of domestic relations." ***DeSylva v. Ballentine***, 351 U.S. 570, 580, 76 S. Ct. 974, 100 L. Ed. 1415 (1956). Divorce, alimony, support and maintenance are issues within the exclusive domain of the state courts. ***Boddie v. Connecticut***, 401 U.S. 371, 389, 28 L. Ed. 2d 113, 91 S. Ct. 780 (1971) (Black, J., dissenting). We agree, therefore, with the Second Circuit's reasoning in ***In re Spong***, 661 F.2d at 9, that Congress could not have intended the bankruptcy courts to ignore well developed state law principles of domestic relations in determining whether a particular loan assumption is "in the nature of" alimony or support for purposes of the bankruptcy act.
>
> Neither the case law nor legislative history, however, resolve the extent to which resort to state law would be appropriate. The rationale that has prevailed in varying degrees before most bankruptcy courts as well as the Second Circuit in *In re Spong* is that ***while state law is not binding, it nonetheless may provide a useful source of "guidance."*** *E.g.*, *Id*.; ***In re King***, 15 B.R. 127, 129 (Bankr. Kans. 1981); ***In re Allen***, 4 B.R. 617 (Bankr. E.D. Tenn. 1980); ***In re Pelikant***, 5 B.R. 404 (Bankr. N.D. Ill. 1980); ***In re Dirks***, 15 B.R. 775, 779 (Bankr. N.M. 1981). Yet, there is little agreement as to what the vague term "guidance" actually means. Some bankruptcy courts have utilized state law to determine whether there is an underlying "obligation" to pay alimony or support in the first instance. ***See In re French***, 9 B.R. 464, 468 (Bankr. S.D. Cal. 1981); ***In re Miller***, 8 Bankr. 174, 3 Collier Bankr. Cas.2d 595, 598 (Bankr. N.D. Ohio 1981); ***In re Warner***, 5 B.R. 434, 440-41 (Bankr. Utah 1980); ***In re Pelikant***, 5 B.R. 404 (Bankr. N.D. Ill. 1980); ***In re Lowell***, 3 Bankr. 401, 404 (Bankr. N.D.Ga. 1980). Similarly, some courts have considered the amount of support a state court would have reasonably granted as a relevant factor in determining whether the loan assumption was actually in the nature of support. ***See***, ***e.g.***, ***In re Jeffrey Lowell Williams***, 3 B.R. 401, 404 (Bankr. N.D. Ga. 1980); ***In re French***, 9 Bankr. 464, 468 (Bankr.S.D. 1981). A few

> bankruptcy courts have also considered whether some provision is made for termination of the debtor's sole responsibility for the assumed obligation upon remarriage of the former spouse or age of majority in the children. *See*, *e.g.*, *Matter of Martin*, 19 B.R. 367 (Bankr. M.D. Fla. 1982); *In re Dirks*, 15 B.R. 775 (Bankr. N.M 1981); *Matter of Taft*, 10 Bankr. 101, 4 Collier Bankr. Cas.2d 65 (Bankr. Conn. 1981).

*In re Calhoun*, 715 F.2d 1103, 1107–08 (6th Cir. 1983) (emphasis added).

While the federal bankruptcy court may look to state law when determining the treatment to be given the guardian *ad litem* fees awarded in this case, it is entirely within the province of the federal bankruptcy court, not this court, to determine the applicability of § 523(a)(5) to such fees. *See Lockwood v. Swartzberg*, 148 B.R. 45, 46 (Bankr. E.D. Wis. 1992) ("Whether a debt is classified as support, and therefore excepted from discharge, is a federal question, not a state law question; however, the function of the guardian *ad litem* under state law provides guidance in determining how the debt should be treated under bankruptcy law); *Laney v. Laney*, 53 B.R. 231, 235 (Bankr. N.D. Tex. 1985) ("While this Court does not presume to dictate to the state court that which is or is not a support obligation, it is clear that the determination of whether a particular debt is a support obligation, for purposes of determining dischargeability, is a function of federal bankruptcy law, and not state law."). Mr. Wykoff concedes as much in his brief when he states that "no court in Tennessee has published an opinion discussing the specific issue," but he cites to the opinions of *federal bankruptcy courts* in an attempt to persuade this Court to address the issue.

The question of law presented by Mr. Wykoff lies within the exclusive jurisdiction of the federal bankruptcy court. Accordingly, we are without jurisdiction to entertain this issue and it is dismissed.

## IV.
### CONCLUSION

For the foregoing reasons, we affirm the juvenile court's decision to terminate the parental rights of the Appellants. Furthermore, we dismiss the issue presented by the guardian *ad litem* because this Court is without jurisdiction to entertain the issue. Costs of this appeal are taxed to the Appellants, Teresa Rice and Gregory Rice, and their surety, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, JUDGE