# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs March 12, 2014

## IN THE MATTER OF RYAN K. M., ET AL.

### Direct Appeal from the Circuit Court for Chester County
### No. 13-CV-30    Donald H. Allen, Judge

_____

### No. W2013-02201-COA-R3-PT - Filed April 23, 2014

_____

Mother's parental rights to her three sons were terminated after she pled guilty to the second degree murder of a fourth son. On appeal, Mother concedes that termination grounds were proven by clear and convincing evidence; she challenges only the trial court's finding that termination of her parental rights is in the children's best interest. We affirm the trial court's best interest finding, and thus, its termination of Mother's parental rights.

### Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Affirmed

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the Court, in which DAVID R. FARMER, J., and HOLLY M. KIRBY, J., joined.

G. W. Sherrod, III, Henderson, Tennessee, for the appellant, Stephanie M.

Robert E. Cooper, Jr., Attorney General and Reporter, Ryan L. McGehee, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services

Lanis L. Karnes, Jackson, Tennessee, Guardian *Ad Litem*

## OPINION

## I. FACTS & PROCEDURAL HISTORY

This is a termination of parental rights case involving three children. On April 21, 2011, the Department of Children's Services ("DCS") received a referral for alleged lack of supervision and nutritional neglect regarding a six month old male child, Clever M. The child's mother, Stephanie M. ("Mother") had presented the child at a physician's office and the unresponsive child was immediately transferred to the Jackson-Madison County General Hospital Neonatal Intensive Care Unit. Upon arrival at the hospital, the child was in cardiac arrest and he was later pronounced dead. At the hospital, Mother tested positive for marijuana use. An autopsy determined that Clever had "starved to death" and the autopsy listed "[c]omplications of chronic malnutrition"as his cause of death and "homicide" as his manner of death. As a result of Clever's death, Mother pled guilty to aggravated child abuse and second degree murder. She was sentenced to twenty years in prison.[1]

On April 28, 2011, DCS filed a Petition in the Chester County Juvenile Court against Mother and the father of at least two of Mother's children, Devin D., seeking to adjudicate Mother's then-twenty month old and three year old sons, Tyler D. and Stephaun A.E.M., dependent and neglected. That same day, a Protective Custody Order was entered placing Tyler and Stephaun in DCS custody. While incarcerated, Mother gave birth to another child, Ryan K.M. Shortly after the child's birth, DCS filed a Petition to adjudicate Ryan dependent and neglected.[2]

On May 22, 2012, the juvenile court entered Adjudicatory and Dispositional Hearing Orders finding that Mother's three children were dependent and neglected and that their deceased sibling, Clever, had been the victim of severe child abuse as defined in Tennessee Code Annotated section 37-1-102(23), perpetrated by Mother and Devin D.

On June 12, 2013, DCS filed a Petition for Termination of Parental Rights in the Chester County Circuit Court against Mother, Devin D., and Unknown Fathers as to Tyler, Stephaun, and Ryan, alleging against Mother the grounds of abandonment by an incarcerated parent, Tenn. Code Ann. §§ 36-1-113(g)(1) and Tenn. Code Ann. § 36-1-102(1)(A)(iv);

---

[1]Devin D., who lived with Mother and Clever, was found guilty of criminal neglect homicide and aggravated child abuse. Father apparently appealed his conviction and the appeal was unresolved at the time of the parental termination trial.

[2]DNA tests confirmed that Devin D. is the biological father of Tyler and Ryan. It is unclear whether Devin D. was also the biological father of Clever M.

severe child abuse, Tenn. Code Ann. § 36-1-113(g)(4); ten year sentence, Tenn. Code Ann. § 36-1-113(g)(6); and sentence of more than two years for severe child abuse, Tenn. Code Ann. § 36-1-113(g)(5).

A trial was held on July 17, 2013. On August 30, 2013, the circuit court entered an Order terminating Mother's parental rights finding that all termination grounds alleged by DCS had been proven by clear and convincing evidence and that termination is in the children's best interest.[3] Mother timely appealed.

## II. ISSUES PRESENTED

On appeal Mother concedes that termination grounds were proven by clear and convincing evidence; she challenges only the trial court's finding that termination of her parental rights is in the children's best interest. For the following reasons, we affirm the trial court's best interest finding, and thus, its termination of Mother's parental rights.

## III. DISCUSSION

"A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the Due Process Clause of the federal and state constitutions." *In re J.C.D.*, 254 S.W.3d 432, 437 (Tenn. Ct. App. 2007); *In re Audrey S.*, 182 S.W.3d 838, 860 (Tenn. Ct. App. 2005). Although the parent's right is fundamental and superior to the claims of other persons and the government, it is not absolute. *In re J.C.D.*, 254 S.W.3d at 437. A parent's right "continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination." *Id.*; *see also In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).

In Tennessee, proceedings to terminate a parent's parental rights are governed by statute. "Parties who have standing to seek the termination of a biological parent's parental rights must prove two things." *In re Audrey S.*, 182 S.W.3d at 860; *see also In re M.J.B.*, 140 S.W.3d at 653. First, they must prove the existence of at least one of the statutory grounds for termination, which are listed in Tennessee Code Annotated section 36-1-113(g). *Id.* Several grounds for termination are listed in subsection (g), but the existence of any one of the grounds enumerated in the statute will support a decision to terminate parental rights. *In re S.R.C.*, 156 S.W.3d 26, 28 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). Second, the petitioner must prove that terminating parental rights is in the child's best interest, considering, among other things, the factors listed in Tennessee

---

[3]Devin D.'s parental rights were also terminated. He is not a party to this appeal.

Code Annotated section 36-1-113(I). ***In re Audrey S.***, 182 S.W.3d at 860. Because no civil action carries graver consequences than a petition to sever family ties forever, both of the elements for termination must be proven by clear and convincing evidence. ***Id.*** at 860-61. In sum, "[t]o terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest." ***In re F.R.R., III***, 193 S.W.3d 528, 530 (Tenn. 2006) (citing *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). Clear and convincing evidence has been defined as evidence that "eliminates any serious or substantial doubt concerning the correctness of the conclusion to be drawn from the evidence." ***In re L.J.C.***, 124 S.W.3d 609, 619 (Tenn. Ct. App. 2003) (quoting *In the Matter of: C.D.B., S.S.B., & S.E.B.*, 37 S.W.3d 925, 927 (Tenn. Ct. App. 2000)). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. ***In re Audrey S.***, 182 S.W.3d at 861.

As stated above, on appeal Mother concedes that grounds for termination exist; she challenges only the trial court's finding that termination of her parental rights is in the children's best interest. Once a ground for termination is established by clear and convincing evidence, we must consider whether termination of parental rights is in the child's best interest. In evaluating the child's best interest, we are to consider numerous factors including those set forth in Tennessee Code Annotated section 36-1-113(I):

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
>
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
>
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological

-4-

abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parents or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

"This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005) (citing *State v. T.S.W.*, No. M2001-01735-COA-R3-JV, 202 WL 970434, at *3 (Tenn. Ct. App. May 10, 2002)). "The child's best interest is to be determined from the perspective of the child rather than the parent." *In re Brandon J.G.*, No. M2013-01832-COA-R3-PT, 2014 WL 791934, at *10 (Tenn. Ct. Ap. Feb. 25, 2014) (citing *State Dep't of Children's Servs. v. L.H.*, No. M2007-00170-COA-R3-PT, 2007 WL 2471500, at *7 (Tenn. Ct. App. Dec. 3, 2007); *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004)).

At the trial in this matter, several witnesses testified regarding the circumstances surrounding Clever's death.[4] At birth, Clever weighed 7 pounds, 4 ounces; however, at six months old, he weighed only between 3 pounds, 11 ounces and 10 pounds, 3 ounces[5]–significantly less than the at least thirteen to fourteen pounds that he should have weighed. On the date of his death, Clever was described as cachectic–"skin hanging over bones." He exhibited obvious signs of malnutrition such as emaciation and lethargy. He was "very dehydrated[,]" he had eczema "all over his face. . . . [which] was open and

---

[4]Additionally, Dr. Lisa Piercey's deposition was submitted into evidence.

[5]A DCS investigator testified that Clever weighed 10 pounds, 3 ounces at his death, Dr. Lisa Piercey testified that he weighed approximately 9 pounds at death, and the autopsy listed his weight as 1700 grams, or 3 pounds, 11 ounces.

bleeding[,]" and he had "caked on white hanging skin" on his bottom.

Mother denied starving the child, but she admitted to causing his death by neglecting to take him to the doctor sooner, knowing he was underweight. Despite expert testimony indicating that Clever should have received five routine physician checkups between birth and six months of age, Mother testified that she had taken Clever to see a doctor a single time, when he was eight days old. Mother claimed that the child was well until the day before his death when he developed a cough, a rash, shortness of breath and some lethargy. However, Dr. Lisa Piercey, an expert in child maltreatment and pediatrics, testified that Clever's condition "[a]bsolutely [could] not" have developed in a single day. Instead, she testified that his degree of weight loss "would have taken several weeks, maybe even months." Dr. Piercey testified that Clever's caretaker "absolutely" would have been aware of his poor condition. She stated, "Any competent adult that was around this infant would have readily recognized that there was something not right about this infant at all. . . . [A]nybody that had direct contact with this baby as far as handling the baby, this baby would feel like a bag of bones." When questioned regarding the risk of allowing Clever's caretakers to care for other children, she responded, "Obviously any caretaker that has knowingly let a child starve and suffer a long, slow, and excruciating death I would be very hesitant to allow any child in that caregiver's presence." She stated it would be "very unlikely" that Clever's caregiver could provide appropriate care for older children.

At the time of trial, Stephaun, Tyler, and Ryan were ages five, three, and twenty-one months, respectively. Stephaun and Tyler had been in foster care for over two years, and Ryan had been in foster care since birth. All three were in the same foster home and had been in that home since coming into DCS custody.

The boys' foster mother testified that the boys do not ask about Mother and they have not seen her since entering DCS custody. She stated that the children have blended into her family, which includes two older children, as well as into her church family. She testified that she and her husband wish to adopt the children and that they are able to meet the children's financial, educational, medical, emotional, and psychological needs. The foster mother stated that if the children were removed, "it would be very devastating to them and to us."

A DCS family service worker similarly testified that Mother has no meaningful relationship with the children and that the children "are very attached and bonded to the foster parents" whom they refer to as "Mom and Dad." She stated that the children are blended into their foster family "[j]ust as if they were born to that family." The family service worker indicated that when Stephaun entered DCS custody at three years old, he was completely non-verbal. However, he had since been identified as having a learning

disability, he had enrolled in Head Start and speech therapy, and he could now speak in complete sentences. The family service worker testified that Tyler and Ryan were also developing appropriately. She expressed her opinion that a change of caretakers would have a negative effect upon the children.

At trial, Mother admitted that she has a history of drug abuse and she confirmed that, because of her perpetration of Clever's death, she would not be released from prison for at least fifteen years. She acknowledged that her incarceration prevented her from being able to care for the children and she agreed that it is in the children's best interest to be with a permanent family who can provide stability and meet the children's medical, financial and educational needs. In fact, she testified, "I know that they're in [a] very good place. They're being well taken care of. . . . I'm very happy about where my children are right now." However, she stated, "I don't feel that a termination would be in their best interest because I do love my children. I admit I made some faults. I neglected to do some things. But as far as me just not caring about them and the fact that I don't love them would both be a lie. I want to be in my kids life [sic]. And I want them to know who their mother is."

In her appellate brief, Mother makes a concise argument regarding the trial court's best interest determination. She argues that DCS failed to prove by clear and convincing evidence that termination is in the children's best interest. In support of this argument, she points only to her trial testimony in which she acknowledged her past mistakes and in which she emphasized her love for the children and her belief that they should know their mother.

Frankly, we find it hard to imagine that DCS could have presented clearer or more convincing evidence that termination of Mother's parental rights is in the best interest of these children. Mother allowed the children's brother to starve to death and because of her incarceration for second degree murder of the child, she has no relationship whatsoever with the children and she will be unable to care for them for at least fifteen years. In contrast, the children have lived together with their pre-adoptive foster family for essentially their entire lives where they are developing appropriately and from where removal would be detrimental. Based upon the overwhelming evidence before us, we affirm the trial court's best interest finding, and thus, its termination of Mother's parental rights.

## IV. CONCLUSION

For the aforementioned reasons, we affirm the trial court's best interest finding, and thus, its termination of Mother's parental rights. Costs of this appeal are taxed to Appellant, Stephanie M., and her surety, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.