IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 9, 2007

## IN RE: D.C.C. and J.E.C.

**Appeal from the Juvenile Court for Dickson County**
**No. 01-07-008-CC     A. Andrew Jackson, Judge**

---

**No. M2007-01094-COA-R3-PT - Filed March 3, 2008**

---

Following a lengthy hearing, the trial court terminated the parental rights of the mother of two year-old twin boys on multiple grounds.  We affirm the termination.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR. and RICHARD H. DINKINS, JJ., joined.

Lindsay C. Barrett, Dickson, Tennessee, for the appellant, M. J. C. C.

Robert E. Cooper, Jr., Attorney General and Reporter, Amy T. McConnell, Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

## OPINION

### I.

The children at the center of this case are twin boys, D.C.C. and J.E.C.  They were born prematurely at 32 weeks gestation on April 7, 2005.  D.C.C. has been relatively healthy, but J.E.C has been diagnosed with cerebral palsy, asthma, a congenital heart defect and colon problems.  He was hospitalized several times for pneumonia and has had to undergo intestinal surgery.  Unfortunately, the parents have demonstrated that they were woefully unprepared to take care of these children.  Mother suffers from issues of mental health and mental retardation.  Father has not shown much interest in the children, has obstructed attempts to help them, and finally surrendered his rights regarding them.

In response to allegations of environmental neglect and medical maltreatment, Stephanie Ellis of Child Protective Services ("CPS") visited the family's home in October of 2005 and found it to be in deplorable condition.  The home was cluttered and infested with cockroaches in every room.  There were dirty dishes on the stove and in the sink.  There was no running water, but the

parents were continuing to use the toilet, which was filled with urine and feces. Photographs of the home are found in the record, and they confirm this state of affairs.

Ms. Ellis helped find a new apartment for the family in Dickson. The Department of Children's Services ("DCS" or "Department"), through CPS, paid the first month's rent and arranged a payment plan for the security deposit. The apartment was within walking distance of doctors' offices, across the street from the grocery store, and close to the social services office, where the parents could get help with food stamps and other needs.[1] CPS also procured two baby cribs for the infants, and implemented various programs to help the parents care for the children and insure the children's welfare, such as Family Support Services, Tennessee Early Intervention, and Nurses for Newborns.

Ms. Ellis returned to the apartment for two follow-up visits in November and December of 2005. She found that many of the same conditions that required the move from the previous home had been duplicated in the new apartment, including cockroaches in the bathroom. These conditions were also documented by photographs. Ms. Ellis picked J.E.C. up out of his crib. He was wet and smelled of urine and feces, and appeared to have been lying in that state for quite a while. J.E.C. had recently been hospitalized and had undergone colon surgery.[2] J.E.C. will need additional surgery in the future. He also has to use a breathing machine for lung treatments when he is at home. Ms. Ellis asked Mother to show her how to use the machine, but Mother said that Father gave J.E.C. the treatments when he came home at night, and that she did not do it. Mother stated that in the event that J.E.C. needed a breathing treatment and Father wasn't there, she would perform CPR. She was asked how she would do that, but she could not demonstrate it.

Ms. Ellis also received reports from other service providers that the parents had not been cooperating with those agencies or availing themselves of the assistance that was available, that they were uncooperative, would not answer the door for scheduled appointments, and refused to sign paperwork. These agencies expressed concern about the safety of the children.

Ms. Ellis filed a petition for temporary custody on December 2, 2005, and the court granted it. The Department removed the children from the home, placed them in a foster home, and filed a dependency and neglect petition in the Juvenile Court of Dickson County, accompanied by an affidavit of reasonable efforts. On October 25, 2006, the trial court adjudicated the children dependent and neglected and appointed a guardian ad litem for them.

Meanwhile, shortly after the removal of the children from their parents' care, DCS caseworkers met with both parents on January 20, 2006, and presented them with a permanency

_____

[1]The record shows that the mother receives a disability check of $623 a month. The father apparently was in the habit of taking this check, and giving the mother $10 or $20 for her monthly expenses. Mother was asked at trial why she was on disability. She said she didn't know, and that her mother handled all that.

[2] Mother told Ms. Ellis that the doctors had found cockroach shells in his stomach.

plan. The foster parents and Father's mother also attended the meeting. The plan set a goal of family reunification, with a target date of January 20, 2007.[3]

The plan included a provision for supervised visitation, to be scheduled by the parents at least three days ahead of time. Among other things, the parents were required to contact the Department about any changes in address, phone number, and employment. Maintenance of stable housing and income was listed as a requirement to reach the desired outcome of reunification. Additionally, Mother was required to maintain mental stability (through consistently taking her medication, it must be presumed); obtain a parenting assessment and follow all recommendations; appropriately parent her children; cooperate with service providers, such as Homemaker Services; and learn to care for J.E.C's medical needs, including administering medication as directed and following doctor's recommendations.

DCS, through case worker Sarah Somerall, and several other agencies attempted to help the parents meet the permanency plan objectives and provide needed services, including therapeutic visitation with the children through Kids First, coordinated or supervised by Nancy Geyser, and Family Solutions, which provided parenting skills training and therapy. The DCS caseworker and several other social workers from agencies involved with the family gave the parents their phone numbers and told them they would be available whenever necessary to help them with transportation or with any other needs. The parents did call for help now and again, but they did not try to notify the Department of their frequent changes of residence, and they frequently changed their cell phones and phone numbers without informing anyone. Although Mother had her own cell phone for some part of the time, she stated her husband would not let her use it. Several of the agencies closed their files on the parents by the end of 2006 due to lack of contact and follow through.

Despite the services offered and provided, the year following the children's removal was a chaotic one for the parents, involving at least five moves. The parents were evicted in March of 2006 from the apartment that DCS had helped them obtain. They moved to another apartment where they stayed only three months and failed to pay rent. For a while, they lived with friends. At another point they moved into a crawlspace under someone's house without the knowledge or permission of the residents. When the worker from Family Solutions learned about this situation, she drove around looking for them, located them, and helped them get copies of their birth certificates and social security cards so they could get public housing, paying the fees herself. However, the parents never provided the Housing Authority with proof of social security payments, so they were never provided housing. The same worker provided transportation to visitation, to the pharmacy for medication, and to the emergency room several times.

During this time, visitation with the children was sporadic at best, and appears only to have involved Mother. Social workers arranged appointments for such visitation and provided transportation. Often, Mother would cancel scheduled visits on short notice. Ms. Geyser, with Kids

---

[3] The father refused to sign the permanency plan without his attorney present. The mother's signature is found on the plan, but she later denied that the signature on the plan was hers. A witness testified, to the contrary, that Mother signed the plan.

First, supervised two visits in April 2006, after which it was difficult to locate Mother. In 2006, Ms. Geyser supervised only 5 or 6 visits. Months went by without any visitation.[4] There was one visit in November of 2006.

The quality of Mother's infrequent visits left much to be desired. Ms. Geyser, who supervised the visits, testified that Mother did not know when to check the babies' diapers or when to feed them. She tended to hold them on her lap in such a way as to put them in danger of falling. Ms. Geyser tried to teach her parenting skills, but Mother did not retain the lessons from one visit to the next.

After the petition to terminate was filed, but before the trial, DCS resumed supervised visitation, which Mother attended regularly with her grandmother. During the visits shortly before trial, Ms. Geyser observed that Mother could not take care of or pay attention to both the children at the same time. Mother tried to feed the children in order to comfort them, but did not know when to stop. During these visits, Mother's grandmother did most of the parenting. Ms. Geyser concluded that Mother's limitations made her incapable of raising these children.

According to Mother's testimony, Father abandoned her in October of 2006 by taking her to her grandparents' house and leaving her there.[5] Several witnesses later testified that Father had exercised a great deal of control over Mother and that she had submitted meekly to his control. Father consistently resisted or avoided interactions with the social agencies and declared that he was the decision-maker in the family. According to Mother, he did not allow her to make or receive phone calls to arrange visitation or other services. One witness characterized Father as loud, argumentative and belligerent. Mother's grandmother testified that she had been unable to help Mother with the children when Mother was still with Father, because Father did not allow Mother to spend time with her family. Father had controlled the family's finances, including the responsibility for paying rent, etc.

After Father left her, Mother stayed with her grandparents for a few months, then apparently stayed in a homeless shelter for a while, and finally got an apartment of her own in Dickson in February of 2007, after the petition for termination had been filed.

Sometime in late 2005 or early 2006, Mother was hospitalized after attempting suicide. As a condition of her discharge, she underwent a clinical intake at Centerstone. Mother reported that she had suffered from depression most of her life, had been hearing voices since childhood, and had been abused as a child. The result of the clinical intake interview were recommendations for individual counseling and a psychiatric intake interview. After the psychiatric intake, Mother agreed to a psychiatric evaluation, medical management, case management, and individual therapy. However, Mother kept only one therapy appointment and a couple of case management

---

[4]In an order entered December 20, 2006, the juvenile court found that Mother had not attended any visitation from May 26, 2006 to November 3, 2006.

[5]Mother stated at trial that she intends to divorce Father and that she has not seen him since their separation.

appointments. After Mother failed to keep any appointments for three months, Centerstone closed its file.

On July 14, 2006, Mother was again hospitalized after attempting suicide again.[6] At another intake interview by Centerstone, Mother denied any suicidal ideations, reported hallucinations and flashbacks, and claimed she could read minds and was floating. Mother missed her scheduled follow-up appointments at Centerstone. In November of 2006, Mother made a frantic suicidal telephone call to one of her case managers, who was able to determine Mother's location and notify 911. Mother was again hospitalized, and Centerstone again became involved. Mother was diagnosed with psychotic disorder, chronic post-traumatic stress syndrome, and depressive disorder.

Mother had been prescribed medication for her psychiatric illness, but did not take it regularly. One of the caseworkers paid to refill the medication at one point. She later testified that it was when Mother ran out of medication that she would be hospitalized.

Mother had failed to attend a parenting assessment, as required and arranged by DCS in June of 2006. The assessment was rescheduled for August of 2006, but initially no one answered the door when the assessor went to Mother's home or answered the telephone. Mother finally agreed to the assessment. During the interview, Mother stated that she had grown up in an abusive home. The assessment recommended individual counseling for Mother and parenting education. At trial, Mother testified that she had been receiving counseling at Centerstone for about two months.

On January 16, 2007, a few days after Mother failed to show up for scheduled visitation, the permanency plan was amended to add adoption as a possible goal. The next day DCS filed a Petition for the Termination of the Parental Rights of both Mother and Father. The grounds alleged were abandonment by failure to visit, abandonment by failure to provide a suitable home, substantial non-compliance with the permanency plan, persistence of conditions, and mental incompetence.

Among other things, the petition alleged that Mother had visited with the children only once in the four months prior to the filing of the petition. It also alleged that she had been diagnosed with mild mental retardation, paranoid schizophrenia, post traumatic stress disorder and depression, and that she was unable to independently manage her own care, "much less the care of two small children." On January 24, 2007, Father executed a voluntary surrender of his parental rights. Subsequent proceedings therefore only involved Mother's rights.

## II. COURT PROCEEDINGS

The hearing on the petition for termination was conducted on April 30, 2007. Mother was represented by appointed counsel. The guardian ad litem was also present and participated in questioning and cross-examination. Mother had resumed visitation with the children after the petition for termination was filed, accompanied by her grandmother on each of those visits, and the

---

[6]Mother allegedly held a knife to her own throat and threatened to kill herself.

grandmother filed a motion to intervene a few weeks before trial, asking that custody of her twin great-grandchildren be placed with her.[7]

At the hearing on the petition, Mother was questioned about the circumstances under which her children were removed, her history of moving from place to place, her interactions with various social workers and agencies, and her understanding of J.E.C.'s medical condition and medical needs. She experienced difficulty responding to some of the questions, frequently answering that she did not know or did not remember. Some of the most disputed testimony involved the number of times she had visited with the children in the four months prior to January 17, 2007, the date the petition for termination was filed. Mother claimed at least four visits during that period,[8] while other witnesses testified that only one visit occurred, on November 3.

Mother was asked about her knowledge of J.E.C.'s health problems. She stated that neither child had to take any medicine, "only their vitamins." When J.E.C. had been admitted to the hospital in March of 2006 for pneumonia, the DCS caseworker had informed the parents and offered to take them to the hospital to see the child, but they declined to go.

In fact, J.E.C. suffered from a congenital heart defect, colon problems, and lung disease. His medical problems required regular visits to a neurologist, a respiratory specialist, a cardiologist, and a pediatrician. His lung disease led to severe respiratory difficulties that would often result in hospitalization. His illnesses had required that his foster mother monitor oxygen levels in his blood and administer twice daily inhalers and nebulizer treatments. Prior to trial he had been diagnosed with cerebral palsy and problems with his leg muscles that required regular injections and the use of leg braces.

At trial, Mother was also asked about her mental health history and prior incidents she had related. She flatly denied that she had ever attempted suicide, that she heard voices, or that she had ever said that she could read minds. She argued that she knew she was not schizophrenic because some friends in Wayne County told her she was not. She also claimed that she could speak 29 languages.

After Mother testified, the Department called seven social workers who had been involved with Mother and the children. They represented different agencies: DCS, CPS, Family Solutions, Centerstone, and Kids First. Each social worker was careful to testify only as to her own interactions with the family. The previous section of this opinion summarizes the most relevant points of that testimony.

Several of the witnesses had the opportunity to observe Mother's interactions with the children during those visits that did occur, and all testified that she seemed to lack the skills and

---

[7]The trial court denied the grandmother's motion before taking up the petition for termination of parental rights. The grandmother has not appealed from that order.

[8]Mother subsequently admitted that there was no visitation on January 11, and said she had been sick on that date.

understanding that are necessary for the care of young children. She stated at one point that she believed the best way to raise children was just to give them anything they wanted. She tried to give a quarter to one of the children, and she was annoyed and didn't seem to understand when the social worker explained why that was not a good idea. It also took all of Mother's attention to deal with one child, and when doing so she did not seem to notice when the other one wandered off or got into something he should not have.

None of the witnesses wanted to blame or stigmatize Mother for the sad situation. As one witness said,"[the mother] appeared to be concerned. She did the best she could for the kids."

The children's foster mother, together with her husband, had been caring for the twins since they were seven months old. She testified that J.E.C.'s numerous medical conditions make it necessary for him to be seen on a regular basis by the earlier named specialists, most of whom were out of the county. Accordingly, she has to take him to Vanderbilt Medical Center or to a doctor in Franklin at least once a week, and sometimes twice. J.E.C. has had pneumonia several times, and after hospitalization he came home on oxygen, from which he had to be weaned. The foster mother testified that she loves the children and wants to adopt them.

Mother's grandmother also testified. Now that Father was gone, the grandmother was able to take Mother to her doctor's appointments and to visits with the children. She acknowledged that Mother was slow and had to struggle with a disability all her life, but she testified that Mother interacted well with the children. She further declared her willingness and availability to help Mother with child care and with any of her other needs.

The guardian ad litem, who had been involved in this case from the very beginning, argued that the key issue in this case was the mother's mental condition. He stated that he did not believe Mother intended to neglect the children, but that she would never be capable of taking care of them without assistance, and thus that the conditions that led DCS to take custody of them were bound to persist. He also agreed with DCS that it was in the best interest of the children that the mother's parental rights be terminated.

At the conclusion of closing arguments[9] the trial court granted the petition for termination. Its ruling was memorialized in an order dated May 16, 2007, which included extensive findings of fact. The court found that DCS had proved multiple grounds for termination by clear and convincing evidence and discussed each of the grounds in turn. The court also found by clear and convincing

[9]The Department's attorney argued that grounds for termination had been proved, and that it was in the children's best interest that Mother's parental rights be terminated. She contended that because of her limitations, Mother was incapable of dealing with J.E.C.'s medical conditions, that the foster parents had bonded with the children, and that they were effectively dealing with the strenuous demands that the children's care required. Mother's attorney argued that many of the problems Mother had experienced taking care of her household and her children could be overcome if she received sufficient assistance. She contended that Father's controlling and hostile attitude had been the chief obstacle preventing her from taking advantage of the help that had been offered. The attorney argued that now that Father was out of the picture, it was realistic to believe that the children could be reunited with Mother.

evidence that it was in the best interest of the children that Mother's parental rights be terminated. This appeal followed.

### III. Standards for Termination of Parental Rights

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois,* 405 U.S. 645, 651 (1972); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007), *cert. den.*, 168 L.Ed.2d 729 (2007). However, that right is not absolute and may be terminated in certain circumstances. *Santosky v. Kramer,* 455 U.S. 745, 753-54 (1982); *State Dep't of Children's Services v. C.H.K.*, 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004). Terminating parental rights has the legal effect of reducing the parent to the role of a complete stranger and of severing forever all legal rights and obligations of the parent and of the child; the parent shall have no right thereafter to have any relationship, legal or otherwise, with the child. Tenn. Code Ann. § 36-1-113(*l*)(1). The United States Supreme Court has recognized the unique nature of proceedings to terminate parental rights, stating that "[f]ew consequences of judicial action are so grave as the severance of natural family ties." *M.L.B. v. S.L.J.*, 519 U.S. 102, 119, (1996) (quoting *Santosky*, 455 U.S. at 787, (Rehnquist, J., dissenting)).

The statutes on termination of parental rights provide the only authority for a court to terminate a parent's rights. *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004); *In re Tiffany B.*, 228 S.W.3d 148, 155 (Tenn. Ct. App. 2007). Thus, parental rights may be terminated only where a statutorily defined ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). To support the termination of parental rights, only one ground need be proved, so long as it is proved by clear and convincing evidence. *In the Matter of D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003).

Because the decision to terminate parental rights affects fundamental constitutional rights and carries grave consequences, courts must apply a higher standard of proof when adjudicating termination cases. A court may terminate a person's parental rights only if (1) the existence of at least one statutory ground is proved by clear and convincing evidence and (2) it is shown, also by clear and convincing evidence, that termination of the parent's rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 808-09; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "This heightened standard . . . serves to prevent the unwarranted termination or interference with the biological parents' rights to their children." *In re M.W.A.*, 980 S.W.2d at 622. Due to the significance of the consequences, courts must apply individualized decision-making to a termination decision. *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999); *In re Tiffany B.*, 228 S.W.3d at 156.

In order to be clear and convincing, evidence must eliminate any serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546 (citing *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Such evidence should produce in the fact-finder's mind a firm belief or conviction as to the truth of the allegations sought to be established. *In re M.L.P.*, 228 S.W.3d 139, 143 (Tenn. Ct. App. 2007); *In re Georgianna H.*, 205 S.W.3d 508, 516 (Tenn. Ct. App. 2006). In contrast to the preponderance of

the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is "highly probable" as opposed to merely "more probable" than not. *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005) The burden is on the party seeking to terminate parental rights to present clear and convincing evidence that grounds exist and that termination would serve the best interests of the children. *In re Valentine*, 79 S.W.3d at 546 (quoting *Hodges v. S.C. Toof & Co.*, 833 S.W.2d at 901 n.3.)

The question of whether a statutory ground has been proved by the requisite standard of evidence is a question of law to be reviewed *de novo* with no presumption of correctness. *In re the Adoption of A.M.H.*, 215 S.W.3d at 810 ("As a question of law, the trial court's ruling that the facts of this case sufficiently support the termination ground of willful abandonment are reviewed *de novo* with no presumption of correctness."); *In re Valentine*, 79 S.W.3d at 548 (holding that the question of substantial noncompliance with the requirements of a permanency plan was a question of law reviewed *de novo* with no presumption of correctness).

Consequently, we will review *de novo* with no presumption of correctness the trial court's holding that a ground to terminate was proved by clear and convincing evidence. To the extent the trial court made findings of fact in support of that ultimate conclusion, we review those findings pursuant to Tenn. R. App. P. 13(d), *i.e.*, *de novo* with a presumption of correctness unless the evidence preponderates otherwise. *See In re the Adoption of A.M.H.*, 215 S.W.3d at 808-09; *In re M.L.P.*, 228 S.W.3d at 143-44. In other words, our standard of review will "distinguish between the specific facts found by the trial court and the combined weight of those facts." *In re Tiffany B.*, 228 S.W.3d at 156. A trial court's specific findings of fact are entitled to a presumption of correctness and must meet the preponderance of the evidence standard, while the court's conclusion that grounds exist to terminate is not entitled to a presumption and must meet the clear and convincing evidence standard. *Id*. at 156. Additionally, "[i]n weighing the preponderance of the evidence, great weight is afforded to the trial court's determinations of witness credibility, which shall not be reversed absent clear and convincing evidence to the contrary." *In re the Adoption of A.M.H.*, 215 S.W.3d at 809.

### IV. THE GROUNDS

In the present case, the trial court found that there was clear and convincing evidence of multiple grounds for termination of Mother's rights. As stated earlier, only one ground need be proved to support termination of parental rights, so long as it is proven by clear and convincing evidence. *In the Matter of D.L.B.*, 118 S.W.3d at 367. The facts of this case make it clear to us that the most relevant grounds are based upon Mother's inability to provide care for the children and, as a consequence, the persistence of conditions that necessitate foster care.

### A. Inability to Parent

Grounds for termination of parental rights exists where:

[t]he parent or guardian is incompetent to adequately provide for the further care and supervision of the child because the parent's or guardian's mental condition is

presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or resume the care of and responsibility for the child in the near future.

Tenn. Code Ann. § 36-1-113(g)(8)(B).

The statute further declares that no proof of willfulness on the part of the parent or guardian in the failure to care for the child is required to establish this ground. Tenn. Code Ann. § 36-1-113(g)(8)(C). The reason for explicitly excluding willfulness is to protect children in cases like the present one, where the parent whose rights are at issue would not intentionally do anything to harm the children, but who is incapable of safely caring for them. As our Supreme Court said in *State Dept. of Human Services v. Smith*, 785 S.W.2d 336, 338 (Tenn. 1990), the consequence of denying termination of parental rights of parents who are unfit due to mental illness would be "to condemn a child . . . to a life in serial foster homes without any possibility of a stable, permanent home."

## B. Persistence of Conditions

Another ground for termination of parental rights is often referred to as "persistence of conditions." It is defined in Tenn. Code Ann. § 36-1-113(g)(3) as follows:

The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
    (i) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
    (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
    (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

The persisting conditions need not be only those conditions that led to the initial removal from the home. Instead, as the language makes clear, either those initial conditions or other conditions that would probably cause the child to be subjected to neglect should the child be returned to the parent can be the basis for a finding of persistence of conditions since they prevent the child's safe return to the care of the parent. As the language also makes clear, the purpose behind this ground is to prevent the child's lingering in the uncertain status of foster child if a parent cannot

-10-

within a reasonable time demonstrate an ability to provide a safe and caring environment for the child.[10]

## C. Analysis

The recitation of evidence we set our earlier demonstrates, as to the Mother, a parent who has been unable, for whatever reason, to improve her situation so that there is any likelihood that these children would be able to safely return to her care in the foreseeable future.

The initial concerns about Mother's ability to care for the children, especially with the serious medical problems of one, have not abated. Despite the efforts of the Department and several other social services agencies to help the parents remedy the conditions that prevented them from providing a suitable home for the children, there is no evidence that Mother could provide such a home anytime soon if ever.

There was no improvement in the Mother's living conditions until Father abandoned her and she moved in with her grandmother. Even then, she went to a homeless shelter for some time before moving into an apartment of her own, a couple of months before trial. After Father left, Mother still did not visit her children regularly, making only one visit before the termination petition was filed.

More significantly, there has been no improvement in Mother's parenting skills. Even in the visits that took place shortly before the trial, Mother was incapable of looking after both children at the same time. One child overwhelms Mother's powers of attention to the degree that the other is essentially unattended. Nancy Craig of Family Solutions testified from her observations that Mother "lacked many parenting skills necessary to parent young children." Nancy Geyser observed the visitation that occurred both before and after the improvement in the Mother's circumstances, and it was her testimony that the children would not be safe if left in Mother's custody. "Not that she would intentionally harm them, but I just feel like her cognitive limitations and her mental illness causes her not to have the capability to raise, particularly, twins of this age."

The proof showed that J.E.C.'s medical conditions require special care that Mother has shown herself to be incapable of offering, and that she has only the vaguest idea of the nature of and severity of those conditions or what to do about them.

Much of Mother's inability to parent her children and provide the care they need is related to her mental retardation, psychiatric illness, or emotional instability. Mother was hospitalized three times in 2006, including after Father left her, for suicide attempts. She has long been taking anti-depressant medication, but is inconsistent. She has not followed up with treatment plans, including

[10]There is no dispute that the children have been in foster care for the requisite time. Additionally, the foster mother testified at length as to the foster parents' ability to take care of the children, and that they want to adopt them. Adoption cannot be accomplished unless Mother's parental rights are terminated. Thus, continuation of Mother's relationship with the children greatly diminishes their chances of becoming part of a safe, stable and permanent home.

after Father left her and after her last suicide attempt. While she testified that she was going to regular counseling sessions, those sessions had begun only a few weeks before trial.

Mother denied any mental health issues and denied statements she had made in the past to mental health professionals. She is unwilling or unable to acknowledge her serious mental health issues.

There is clear and convincing evidence of Mother's impairment and her inability to parent her children or provide them with the care they need. There was no indication she will be able to overcome that impairment in the relatively near future to a degree that would enable her to resume custody of the children in the near future.

We conclude, as did the trial court, that there is clear and convincing evidence of incompetency to adequately provide for the care and supervision of the children because of impaired mental condition that makes it unlikely that the parent will be able to provide care in the near future. Tenn. Code Ann. § 36-1-113(g)(8)(B). Additionally, we also agree with the trial court that DCS proved by clear and convincing evidence the existence and persistence of conditions that prevent the children's safe return to the care of the parent; that here is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent in the near future; and that failure to terminate the parent's rights would greatly diminish the children's chances of early integration into a safe, stable and permanent home. Tenn. Code Ann. § 36-1-113(g)(3). Consequently, we affirm the trial court's finding that the Department proved, by clear and convincing evidence, that grounds exist for the termination of Mother's parental rights.[11]

We agree with those involved in this case who expressed sympathy for Mother, but who concluded that Mother had struggled, and was continuing to struggle, to take care of herself and her own needs and simply did not have, nor was she likely to have in the near future, the capacity to also care for these two young children. The legislature has made it clear that in such situations, the children need not be consigned to the uncertainty of foster care for a prolonged period.

## V. BEST INTEREST

The final requirement for termination of Mother's parental rights is proof by clear and convincing evidence that it is in the best interest of the children that her parental rights be terminated. Our legislature has set out a list of factors for courts to consider in determining a child's best interest:

> In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

[11]Although the trial court found other grounds to have been proven, including abandonment by willful failure to visit and substantial noncompliance with the permanency plans, we need not discuss those findings in view of our holding as to these two grounds. We simply note that neither of the grounds upon which we are affirming the trial court's holding requires a showing of willfulness or similar intent and capacity to comply.

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i).

"[T]he statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of the child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). However, in this case numerous factors indicate that termination of Mother's parental rights is in the best interest of the children.

On appeal, Mother does not even challenge the Juvenile Court's finding of best interest, and the evidence is heavily weighted in favor of that finding. The evidence clearly shows that Mother has failed to make a lasting adjustment of circumstances which would make it safe and in the children's best interest to be in her home, despite reasonable efforts by social service agencies to achieve that goal. She does not have a meaningful relationship with these very young children because of her lack of contact with them for so long.

A change of caretakers at this point would be clearly detrimental to the children's welfare. Although there is no evidence that Mother has ever abused the children, or that she has ever abused alcohol or drugs, there is substantial evidence of neglect, stemming at least in part from Mother's mental and emotional status. Her impaired state prevents her from providing safe and stable care and supervision for the children.

In summary, we affirm the trial court's finding, by clear and convincing evidence, that termination of Mother's parental rights is in the best interest of these children.

## VI. CONCLUSION

The order of the trial court is affirmed. Remand this case to the Juvenile Court of Dickson County for any further proceedings necessary. Tax the costs on appeal to the appellant.

_____
PATRICIA J. COTTRELL, JUDGE