IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Submitted on Briefs November 24, 2009

**In the Matter of: A.W.H. and N.N.H.**

**Appeal from the Juvenile Court for Lauderdale County**
**No. J7-367     Rachel J. Anthony, Judge**

_____

**No. W2009-01955-COA-R3-PT - Filed December 29, 2009**

_____

This appeal involves the termination of parental rights. After State authorities received a report that the mother of the two children at issue was using drugs, the mother admitted that she and the father used drugs, and the parents stipulated that their children were dependent and neglected. The children were initially placed with family members. After several months, a no-contact order was entered due to the parents' continued drug use and related issues. The children were then placed in State custody and permanency plans were created. The plans required, *inter alia,* that the parents become drug-free and maintain a stable, safe, and drug-free home. Despite years of counseling, treatment, and periods of abstinence from drug use, the parents continued to intermittently test positive for drug use. DCS filed a petition for termination of the parental rights of both parents. After a trial, the trial court terminated their parental rights on grounds of abandonment, substantial noncompliance with the permanency plans, and persistent conditions. The parents now appeal. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and J. STEVEN STAFFORD, J., joined.

Jobi Teague, Covington, Tennessee for the Appellant/Respondent W.H.

Dee Shaun Peoples, Memphis, Tennessee for the Appellant/Respondent J.H.

Robert E. Cooper, Jr., Attorney General and Reporter, Michael E. Moore, Solicitor General, and Elizabeth C. Driver, Nashville, Tennessee for the Appellee/Petitioner State of Tennessee, Department of Children's Services

# MEMORANDUM OPINION[1]

## FACTS AND PROCEEDINGS BELOW

During their marriage, Respondent/Appellant J.H. ("Father") and Respondent/Appellant W.H. ("Mother") had two children, A.W.H. and N.N.H., born December 15, 1994 and December 12, 1996, respectively. While the children were in their parents' custody, the Petitioner/Appellee Tennessee Department of Children's Services ("DCS") conducted at least nine investigations into the well-being of the children.

On June 8, 2006, DCS received a referral that Mother was abusing drugs. That same day, Mother appeared at a show cause hearing in the Lauderdale County Juvenile Court ("trial court"). At the hearing, Mother admitted that she used methamphetamine and marijuana with Father and said candidly that she needed assistance with her drug use. The trial court placed the children in the temporary custody of Father's sister ("Aunt") and her husband ("Uncle") and set a preliminary hearing for later that month. At the scheduled preliminary hearing, the parents stipulated that the children were dependent and neglected. By agreement, the children were ordered to remain in the temporary custody of Uncle and Aunt, and each parent was order to pay $227 per month in child support. On August 21, 2006, the trial court entered a written order consistent with its oral rulings.

On January 8, 2007, Aunt filed a petition for termination of the parents' visitation, asserting that they continued to use drugs, failed to pay any child support, and had been arrested for domestic violence. After a hearing, the trial court suspended the parents' contact with the children until they completed three drug education and parenting sessions, passed three random consecutive drug screens, and no longer had "law enforcement issues." The parents were also found in contempt for failing to pay child support and were incarcerated for ten days.

The next month, on February 1, 2007, Uncle's deteriorating health issues compelled Aunt and Uncle to voluntarily place the children in DCS custody. The initial permanency plans for the children, developed by DCS in February 2007, required the parents to be drug-free and submit to random drug screens, to participate in parenting sessions and learn to parent effectively, and to obtain a stable, safe, and drug-free home environment. Mother reportedly had bi-polar disorder, and was required to follow the directions of her mental health professionals. The goal of the permanency plans was either reunification or placement with relatives. Due to the trial court's prior order, no contact was permitted between the parents and the children at that time.

---

[1]**Rule 10. Memorandum Opinion**

This Court, with the concurrence of all judges participating in the case, may affirm, reverse or modify the actions of the trial court by memorandum opinion when a formal opinion would have no precedential value. When a case is decided by memorandum opinion it shall be designated "MEMORANDUM OPINION", shall not be published, and shall not be cited or relied on for any reason in any unrelated case.

Tenn. Ct. App. R. 10.

To assist the parents in meeting the goals of the initial permanency plan, the DCS case manager worked with them on a weekly to bi-weekly basis. She assisted Mother in getting a mental health intake with Professional Care Services. Both parents were placed on the waiting list for JACOA Rehabilitation Center, and were given information on Alcoholics Anonymous and Narcotics Anonymous meetings. They were given information on how to apply for public housing. Both parents were tested for illegal drugs one to three times per month.

During the winter and spring of 2007, both parents continued to test positive for drug use. During this time, they lived first in a hotel and then in a trailer park. Then, over the course of August and September 2007, Mother passed three consecutive drug screens. Despite the fact that Father had not passed three consecutive drug screens, in October, 2007, DCS filed a petition to lift the no-contact order. The trial court granted DCS's request and lifted the no-contact order. Shortly after that, Mother refused to take two consecutive drug screens; refusal was considered the equivalent of failing the drug screens.

In November 2007, DCS transferred the case to a new case manager. In light of the parents' continued failure to comply with the requirements in the initial permanency plans, both plans were revised on December 26, 2007. The goal was changed from reunification to exiting custody to live with a relative or, alternatively, adoption. The revised plans contained the same requirements for the parents.

During the first several months of 2008, DCS continued to screen both parents for drug use; some results were positive and some were negative. During this time, they were living in a hotel. In March 2008, both parents were admitted for a thirty-day treatment program at a drug rehabilitation center. Both completed the program. At the conclusion of the treatment program, the parents were instructed to attend 90 Alcoholics Anonymous and Narcotics Anonymous meetings in 90 days, to continue alcohol and drug counseling, and to obtain a sponsor. They lived with Mother's sister for about a month, and then lived in an apartment for several months. Neither parent attended the required meetings or acquired a sponsor. After completion of the rehabilitation program, Mother tested negative for drug use and was given unsupervised visitation with the children. Father, however, refused to be tested. In June 2008, both parents tested positive for drug use. During this time period, Mother and Father separated temporarily after a domestic violence incident. They later reconciled and alternated living in two different hotels.

At no time did the parents make the child support payments required under the permanency plans, despite sporadic employment. Father was employed as a roofer and compensated in cash; Mother was sporadically employed at a motel and compensated with room and board. Judgments were eventually entered against both Mother and Father for the child support arrearages.

To determine whether it would be feasible to place the children with relatives, DCS obtained a list from the parents of potential relatives to take custody. The DCS case manager contacted each relative, but none were willing to take custody of the children. Consequently, in December 2008, the permanency plans were revised to eliminate the goal of exiting custody to live with a relative. The sole goal of the revised plans was adoption.

On December 18, 2008, the DCS filed a petition for termination of the parental rights of both Mother and Father. The grounds for termination asserted in the petition included abandonment by failure to visit or support, substantial noncompliance with permanency plans, and persistent conditions that prevented the safe return of the children to their parents' custody. The trial court appointed a guardian ad litem for the children and an attorney for each parent. Discovery ensued.

On March 16, 2009, a trial was held on the petition to terminate. At the hearing, the trial court heard testimony from both DCS case managers, Father, Mother, and the children's foster mother.

At the outset, the first case manager explained how the children came to be in DCS custody and the efforts that she had made to assist the parents in meeting the requirements of the permanency plans. She detailed the drug abuse counseling and housing information that she provided to the parents. During the time she was assigned to the case, both parents continued to fail the required drug screens and lacked a stable home.

In her testimony, the second DCS case manager continued detailing the parents' history of unsuccessful drug abuse treatment and the results of the drug tests given to the parents. She noted that both Mother and Father had tested positive for drug use as recently as two months prior to the trial. She outlined the parents' history of itinerant housing, and said that neither parent had made any child support payments during the time she was managing the case. The case manager explained that reunification was eliminated as a goal because of the parents' persistent drug use and inability to maintain stable housing. She noted, however, that the parents and the children had managed to maintain a loving relationship and that the children wanted to maintain that relationship. She also testified that the children's behavior and school grades had improved significantly while in the care of the foster family.

In his testimony, Father largely corroborated the DCS case managers' testimony about the parents' history of itinerant housing. He admitted that he and Mother were residing in a one-bed hotel room, but explained that he had an oral agreement with the hotel manager that he would be able to obtain another room for the children in the event they were awarded custody. Father added that he was searching for a new place to live, away from the hotel. As to the history of positive drug tests attributed to him, Father claimed that, in many instances, he was credited with a positive drug screen because DCS sent a female employee to administer the test and a female employee could not administer the test for a male subject. Initially, Father maintained that he did not have a drug problem, but later admitted that he did. He acknowledged that the trial court had ordered him to make child support payments, but he could not recall the amount he was ordered to pay. He explained that it was difficult to make payments for two children with only one income between him and Mother.

In her testimony, Mother described having enjoyable visits with the children and giving them presents at Christmas. She claimed that she would have sought more visitation had she realized that she could. Mother admitted to still having a drug problem, but said that she no longer used drugs "every day." Mother acknowledged that she used crack cocaine with Father during the month prior to the trial. She explained that she became stressed at the thought of her children being

adopted, and "just wanted something to forget it." Mother conceded that the trial court had ordered her to pay child support and that she had not done so, apart from giving the children pocket money at visitation and presents at Christmas.

The children's foster mother testified that the children had been in her care for eleven months. She said that the children's grades had improved, that they were participating in extracurricular activities, and that they had made new friends. She said that she hoped to adopt the children, but acknowledged that they still loved their parents very much.

On August 17, 2009, the trial court entered an order terminating the parental rights of both Mother and Father. In the order, the trial court concluded that Mother and Father had abandoned the children by willfully failing to contribute to their support for four consecutive months prior to the filing of the petition; that they had not substantially complied with the provisions of the permanency plans; that the conditions that led to the removal of the children from the parents' custody persisted; and that termination of the parental rights of both Mother and Father was in the best interest of the children. Mother and Father now appeal.

## ISSUES ON APPEAL AND STANDARD OF REVIEW

On appeal, Mother and Father raise the following issues:

1) Whether the trial court erred in finding that the parents had not complied with the requirements of the permanency plans;
2) Whether the trial court erred in finding that Mother and Father did not have stable housing; and
3) Whether the trial court erred in finding that termination of Mother's and Father's parental rights was in the best interest of the children when the children have a strong bond with the parents, as conceded by DCS.

The trial court's findings of fact are reviewed *de novo* with a presumption of correctness, unless the evidence preponderates otherwise. TENN. R. APP. P. 13(d). To terminate parental rights, a trial court must find the existence of one of the statutory grounds for termination set forth in Tennessee Code Annotated § 36-1-113(g), and that termination is in the child's best interest. T.C.A. § 36-1-113(c) (2008 Supp.); *see In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006) (citing *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). Both determinations must be supported by clear and convincing evidence. T.C.A. § 36-1-113(c) (2008 Supp.); *In re F.R.R., III*, 193 S.W.3d at 530 (citing *In re Valentine*, 79 S.W.3d at 546).

"Upon reviewing a termination of parental rights, this Court's duty, then, is to determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d at 530. "[W]hether a statutory ground has been proved by the requisite standard of evidence is a question of law to be reviewed *de novo* with no presumption of correctness." *In re B.T.*, No. M2007-01607-COA-R3-PT, 2008 WL 276012, at *2 (Tenn. Ct. App. Jan. 31, 2008), *no perm. app.* (citing *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007)).

ANALYSIS

### *Statutory Grounds*

At the outset, we note that the trial court determined that three of the grounds for termination under Tennessee Code Annotated § 36-1-113(g) had been proved by clear and convincing evidence: abandonment, substantial noncompliance with the permanency plans, and persistent conditions. T.C.A. § 36-1-113(g)(1)–(3) (2008 Supp.). On appeal, Mother and Father challenge the trial court's determination only as to the ground of substantial noncompliance with the permanency plans. Therefore, the grounds of abandonment and persistent conditions are unchallenged on appeal. "Only one ground need be proved, so long as that ground is proved by clear and convincing evidence." ***R.G.W. v. S.M.***, No. M2009-01153-COA-R3-PT, 2009 WL 4801686, at \*2 (Tenn. Ct. App. Dec. 14, 2009) (citing ***In re D.L.B.***, 118 S.W.3d 360, 367 (Tenn. 2003)). We will nevertheless review the trial court's finding that the parents had not substantially complied with the terms of the permanency plans.

Tennessee Code Annotated § 37-2-403(a)(1) requires the development of a permanency plan for each child in foster care. T.C.A. § 37-2-403(a)(1) (2008 Supp.). The plan is required to include a list of parental responsibilities reasonably related to the permanency goals of the plan. T.C.A. § 37-2-403(a)(2)(A) (2008 Supp.). One ground for termination of parental rights is that "[t]here has been substantial noncompliance by the parent . . . with the statement of responsibilities" in the plan. T.C.A. § 36-1-113(g)(2) (2008 Supp.). "The determination of whether noncompliance is substantial compares the degree of noncompliance with the importance of the unmet obligation." ***In re M.M.M.***, No. W2009-00909-COA-R3-PT, 2009 WL 4505435, at \*7 (Tenn. Ct. App. Dec. 4, 2009) (citing ***In re M.J.B.***, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004)). Therefore, trivial or minor departures from the requirements of the permanency plan will not be deemed substantial noncompliance. ***Id.*** (citing ***In re M.J.B.***, 140 S.W.3d at 656-57)).

In the case at bar, the primary reason that Mother and Father initially lost custody of the children was their admitted drug use. As such, the permanency plans required the parents to be drug-free and to obtain a stable, safe, and drug-free home environment. Pursuant to the permanency plans, both parents attended a drug rehabilitation program and apparently successfully completed it. Mother was apparently able to abstain from drug use for a period of months after completion of the program. Sadly, both relapsed, and thereafter the periods of abstinence from drug use were only intermittent. At trial, both Mother and Father admitted a continuing problem with substance abuse. Both tested positive for drug use two months prior to the trial, and Mother admitted that she used crack cocaine with Father in the month prior to the trial. From our review of the record, we cannot conclude that the trial court erred in concluding that Mother and Father had not substantially complied with the terms of the permanency plans.

### *Best Interest*

In order to terminate parental rights, the court must also find by clear and convincing evidence that termination is in the best interest of the child. *See* T.C.A. § 36-1-113(c) (2008 Supp.).

Tennessee Code Annotated § 36-1-113(i)[2] sets forth the factors that courts use to determine whether termination is in the best interest of the child; however, this list is not exhaustive. *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005) (citing *State v. T.S.W.*, No. M2001-01735-COA-R3-JV, 2002 WL 970434, at *3 (Tenn. Ct. App. May 10, 2002)).

On appeal, Mother and Father emphasize the factor in Section 36-1-113(i)(4), whether the parents have a "meaningful relationship" with the children. They note that the evidence was undisputed that the children continue to love both of their parents. We agree that this is no small factor. The Court is aware that "[f]ew consequences of judicial action are so grave as the severance of natural family ties." *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982) (Rehnquist, J., dissenting)).

Unfortunately, despite the children's love for their parents, the evidence in this case left the trial court with little choice but to conclude that termination was in the children's best interest. Despite repeated opportunities to rehabilitate, the substance abuse of both Mother and Father persisted, even up to a month before the trial. Moreover, at the time of trial, Mother and Father were residing in a one-bed hotel room. Neither Mother nor Father had paid any child support during the entire time in which the children were out of their custody. The evidence gave the trial court no

---

[2] The statute provides as follows:

In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

T.C.A. § 36-1-113(i) (2008 Supp.).

reason to believe that Mother and Father would resolve their substance abuse problems and be able to meet the children's needs. Under these circumstances, we cannot conclude that the trial court erred in concluding that termination was in the best interest of the children.

## CONCLUSION

The decision of the trial court is affirmed. Costs on appeal are to be taxed to the appellants, J.H. and W.H. and their sureties, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE