IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
February 4, 2010 Session

IN THE MATTER OF HAVEN A. B.

Appeal from the Juvenile Court for Davidson County
No. PT96268      Betty Adams Green, Judge

No. M2009-01852-COA-R3-PT - Filed April 28, 2010

The juvenile court granted emergency custody of a four-year-old girl to her paternal aunt and
uncle and subsequently determined that the child was dependent and neglected. More than
two years after obtaining custody, the aunt and uncle petitioned the trial court to terminate
the parental rights of the child's mother and father. The court conducted a four-day hearing
before terminating their parental rights on the grounds of abandonment and persistence of
conditions. Only the mother appealed. We affirm the termination of her rights on the ground
of persistence of conditions.

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed

PATRICIA J. COTTRELL, P.J., M.S., delivered the opinion of the Court, in which ANDY D.
BENNETT and RICHARD H. DINKINS, JJ., joined.

C. Michael Cardwell, Nashville, Tennessee, for the appellants, Angela B. and John B., Jr.

Jennifer L. Evans, Springfield, Tennessee, for the appellees, John S. and Karol S.

OPINION

I. DEPENDENCY AND NEGLECT

The child at the center of this case, Haven A. B., was born on July 7, 2001. Her
parents, John B. ("Father") and Angela B. ("Mother") were married and were employed
when the child was born, but they both suffered from substance abuse problems. Their
relationship deteriorated after the birth of the child, and their substance abuse problems
worsened, leading to divorce, unemployment and the loss of their ability to properly care for
their child.

Mother had held down a job as a licensed practical nurse for thirteen years. She lost that job, as well as her nursing license, after she was caught taking prescription medication from patients. Mother testified that she became addicted to prescription drugs because of back pain, which she attributed to fibromyalgia. Mother admitted that she impersonated her twin sister to obtain medication and that she purchased prescription drugs from drug dealers, on at least one occasion, taking the child with her to a Waffle House for that very purpose.

Father was an experienced carpenter who had worked for many years with other members of his family. The proof showed that he had abused alcohol since he was a teenager and that he had enrolled in numerous alcohol treatment programs over the years, but that even when he successfully completed those programs, he had always relapsed. His alcohol problem worsened as his relationship with Mother deteriorated after Haven A. B. was born, rendering him unemployable and, ultimately, homeless.

As one of seven siblings (five brothers and two sisters), Father was able to call on family members for help when problems arose. Regular gatherings of his large and tightly-knit family during holidays and birthdays punctuated the first years of the child's life. The petitioners in this case are Father's sister, Karol S. ("Aunt"), and her husband, John S. ("Uncle"). Aunt testified that she was involved in Haven A. B.'s life from the very beginning, that she had held the infant and fed her in the hospital on the day she was born. She described becoming aware of the serious dysfunction in the child's home through a series of incidents beginning on August 13, 2004.

On that date, Father called Aunt and told her that Mother, who was distraught over the sudden death of her own mother the day before, had over sedated herself, leaving the child locked in her car for a prolonged period. The police were called to free the child while Mother was passed out inside the home due to her drug overdose. The child stated that she spent the night in the car, that she was very hungry, and that she was afraid. Mother was charged with child neglect because of that incident, but the charges were later dropped.

On August 31, 2005, Father called Aunt to inform her that Mother had again passed out due to a prescription medication overdose and that he was too intoxicated to care for the child. Aunt and Uncle took the child into their home and kept her for three days. On the third day, Father picked up the child and took her to day care.

The extended family gathered for a Thanksgiving celebration in 2005. Father was at the gathering with the child, and Mother was at home. Father was drunk, so his mother and other family members asked him not to drive and not to take the child home in his car. Father became very angry, which led to an altercation. Father had to be physically restrained while an older brother and his wife put the child in their car and took her home. Another

-2-

brother drove Father's car.

Aunt and Uncle obtained physical custody of Haven A. B. on December 28, 2005. On that day, Father called Aunt again and said he needed help because neither he nor Mother was able to take care of Haven. At trial, Aunt testified that Father was intoxicated when she arrived. Mother's twin sister was just sitting in the living room and was completely unresponsive. Mother was in bed in the back bedroom, hard to arouse. The child was sitting on the floor in front of the TV. Aunt vividly described the condition of the apartment when she got there:

> There were at least five or six large whisky bottles scattered throughout the living room. I think they were liter bottles. . . And all of them were empty, with the exception of one, and it was about a third full. . . There was old dried-up pizza – boxes of pizza all over. There were old sacks of fast food. There were dirty dishes in the kitchen area and on the countertop area with dried food. There were ashtrays overflowing. There were coke cans everywhere.

Aunt described the back bedroom where Mother was asleep as littered with vodka bottles, with prescription bottles on every surface, loose medication on top of a dresser, and a huge ashtray full of ashes in the middle of the bed. Father's sister Nancy P. also came to the apartment on that day. Her testimony confirmed Aunt's description of the situation. She also observed a trash can full of empty unlabeled medicine bottles in the bathroom.

Aunt said that the child asked her if she could go home with her. Aunt then talked to both Mother and Father and they agreed. Shortly after going home with Aunt and Uncle, the child began exhibiting disturbing sexualized behavior that they feared might indicate that some form of sexual abuse had been inflicted on the child. Later statements by the child confirmed that this was so.

Uncertain of her legal rights, Aunt contacted the Department of Children's Services where she was advised to file a petition for custody in the Juvenile Court of Davidson County. She did so, and after a hearing on January 12, 2006, the court granted emergency legal custody of the child to Aunt and Uncle. At the suggestion of the court, they arranged for the child to begin psychological counseling shortly thereafter. Following a later hearing, the court ordered Family Support Services to come up with a plan of action to address issues of substance abuse and lack of housing and income in relation to the child. The resulting plan included requirements that Mother undergo an alcohol and drug assessment with a goal of becoming drug free, that she undergo a mental health evaluation and follow the recommendations resulting from that evaluation, and that she take parenting skill classes.

The court conducted a hearing on May 3, 2006, which resulted in a declaration that Haven A. B. was dependent and neglected. The court order recited that Father had conceded that he was unable to care for the child because of his alcoholism and that the evidence showed that Mother was continuing to abuse prescription medication, which resulted in impaired functioning. The court concluded that Mother was addicted to painkillers, that she was not credible, and that like Father, she was unable to care for the child.

The court accordingly declared that legal custody of Haven A. B. would remain with Aunt and Uncle until the final dispositional review, which was set to a later date to give the parents some additional time to address the problems that led to their loss of custody. The court also gave the parents the right to two scheduled phone calls with the child each week, and ordered that all future visitation be supervised through the Exchange Club.

The dispositional hearing was conducted on July 20, 2006. The court heard evidence that Father had made some effort to seek treatment for his alcoholism, but was not successful and that Mother had not yet sought treatment, although she had contacted some individuals for information. The court's findings and conclusions are contained in its order dated August 10, 2006. The court found that Mother was continuing to abuse prescription pain medications and that on one occasion since the dependency and neglect finding, she had lain down in the flow of traffic in an apparent suicide attempt.[1] The court accordingly determined that neither parent had been proved to be capable of caring for the child, and it granted custody to Aunt.

The court acknowledged the importance of visitation if the parents wished to regain custody and set out a detailed plan of supervised visitation for each parent. Mother's cousin Donna P. was designated as the supervisor for Mother's visitation, which was to take place every other Sunday afternoon. Two relatives of Father were designated to supervise his alternating Sunday visitations. The court stated that it "hopes to increase visitation at such time that Mother and Father complete the necessary treatment and they continue in a state of sobriety for some time."

The court also found that for child support purposes, Mother was deemed to be capable of earning $7.50 per hour and Father to be capable of earning $2800 per month. A child support worksheet attached to the trial court's order shows a presumptive child support obligation of $542 for Mother and $1,152 for Father. Mother later claimed that her attorney never explained that the court had ordered her to pay child support, and that she was

---

[1]During the termination hearing, Mother explained that her act was meant to be a cry for help, and that she knew she wouldn't get hurt because traffic was moving so slow.

therefore unaware of the obligation.[2]

Mother appealed the Juvenile Court's ruling to the Davidson County Circuit Court. On March 5, 2008, the Circuit Court conducted a hearing on the appeal. It affirmed all the orders of the Juvenile Court, including the order for supervised visitation as well as the findings of dependency and neglect and of the parents' earning capacity. It also ordered Mother to comply with the Family Support Services plan of action. No further judicial review was sought.

## II. TERMINATION PROCEEDINGS

On September 24, 2008, John S. and Karol S. filed a petition in the Juvenile Court of Davidson County to terminate the parental rights of both Mother and Father and/or to establish guardianship of the minor child. The petitioners alleged, as grounds for termination, that the parents had abandoned Haven A. B. and that conditions persisted which "in all reasonable probability, would cause the child to be subjected to further abuse or neglect and that prevent the child's safe return to the care of the parent." They further alleged that it was in the best interest of the child for the parents' rights to be terminated and for her to be placed with the petitioners for adoption. An amended petition to terminate was filed on March 27, 2009. It alleged that the ground of abandonment by reason of failure to support applied to both parents, and it cited Father's failure to visit the child, but did not specifically mention visitation by Mother.

The trial on the petition was conducted over four days, April 20, 2009, May 1, 2009, May 27, 2009 and May 28, 2009. The court heard twelve witnesses, many of them Father's siblings and other family members. The most extensive testimony came from Aunt, Mother, and the child's psychologist, Dr. Thomas Monroe. Father did not appear in court on the day he was scheduled to testify. The petitioners' attorney moved the court to admit Father's deposition testimony into the record in lieu of his live testimony. The trial court granted the motion.[3]

---

[2]Although the trial court's order of August 10, 2006 mentions child support in regard to the parents' earning capacity, it does not specifically order them to pay support.

[3]The transcript of the hearing of May 1, 2009 shows that Father appeared at the courthouse on that day. The attorney for Aunt and Uncle stated that he appeared to be intoxicated, and she asked for an alcohol screening. Father's attorney disagreed and stated that Father was very ill and was not in a position to participate in the hearing. Father asked to be excused and waived his right to be present in the courtroom. The trial court excused Father from testifying that day, but asked that he be tested. Father's testimony was rescheduled for the next hearing date, but he did not show up.

Aunt testified as to the circumstances that brought Haven A. B. into her custody, which are discussed above. She was questioned about the child's behavior when she first came into her custody, and she testified that the child was initially very erratic, that she was both nervous and clinging, always wanting to be around Aunt and Uncle, and unwilling to be alone in her room. Over time, the child became more trusting, more focused, more emotionally grounded, and more willing to play on her own. She is now enrolled in school, where she is doing well and making friends. Aunt's testimony about the improvement in the child's emotional state and behavior was confirmed by other witnesses, including Uncle, Father's sister Nancy P., his brother Ricky B., and Rachel M., Father's adult daughter from an earlier marriage.

Aunt also testified as to the child's revelations about Father's conduct towards her, including many acts that could be described as child sexual abuse. Since Father has not appealed from the termination of his parental rights, we see no purpose in describing those acts in this opinion. According to Aunt, the child complained that she told Mother about some of the things Father had done to her, but Mother denied that they had happened, which made the child angry at Mother. Aunt stated that the child told her, "I don't like my father. He's mean to me, I like my mommy, but I don't want to live with her. I'm scared to live with her."

The petitioners both testified that when they first obtained custody of Haven, they had no intention of terminating her parents' rights. They had raised two children of their own to adulthood and were looking forward to spending some time together without parental responsibilities. They had hoped that Mother and Father would get counseling and do what was needed to have custody of Haven A. B. restored to them. But especially after learning about the abuse the child had suffered, they were prepared to raise Haven, to protect her, and to give her the childhood that their own children had enjoyed.

Dr. Thomas C. Monroe III is a licensed clinical psychologist with training in recognizing and treating child sex abuse. He testified that he was not the first therapist to treat Haven A. B., but that he had conducted 40 sessions with the child since he began seeing her in May of 2007. According to Dr. Monroe, Haven A. B. gave him detailed accounts of a great number of different incidents of sexual abuse inflicted on her by Father. She also told him about Mother's refusal to believe that she was telling her the truth about those incidents, and she expressed a great deal of anger at Mother for denying what had happened to her.

Dr. Monroe explained that he believed the child was telling the truth because of her demeanor, the consistency of her accounts, and the level of detail she was able to impart. He also asked her questions to find out if she had been coached, and he concluded that there was no coaching. Dr. Monroe reported his one phone conversation with Mother, in which he told

her about Haven's revelations, and Mother responded by saying that she did not believe that any abuse had occurred. Under further questioning, Dr. Monroe testified that there was a "reasonable degree of medical certainty that this child was sexually abused by her father," and that Mother's refusal to believe that such abuse had occurred was very hurtful and very damaging to the child. He also testified that Haven A. B. continued to suffer a great deal of anxiety about contact with her parents, and that if such contact were ended, Haven A. B. would not need any more therapy.

When Mother took the stand during the petitioners' case-in-chief, she admitted that she was addicted to pain medication, but she insisted that she had prescriptions for everything she was taking and that she needs her medication to treat the excruciating pain she suffers because of her fibromyalgia. There is no independent medical verification in the record of that diagnosis. In any event, Mother stated that because of her pain she has difficulties performing her daily living activities, including getting in and out of bed. She also testified that she tried to work after losing her nursing license, but that she began and then lost three or four jobs in retail businesses because her back pain made it impossible for her to stand for the hours required.

The medical records entered into evidence include emergency room treatment summaries from Summit Medical Center, Hendersonville Hospital, and Nashville General Hospital, where Mother went for treatment of lower back pain. A summary at the bottom of the Hendersonville Hospital report exhibits a skeptical attitude about Mother's declared reason for asking for pain medication, notes that she is "quite used to heavy doses of medication and has a history of severe overdosing," and states that she was told that "she would not receive a prescription here, not now or in the future," and that a bulletin was being written on her. Mother's name and prescribing history also appear on a list maintained by the Tennessee Controlled Substance Monitoring Program for the Department of Health. The names of four different doctors who had prescribed controlled substances to Mother and of four different pharmacies that filled those prescriptions are included in the document.

Mother denied that she knew about the Hendersonville Hospital bulletin, but she confirmed under questioning that she has current prescriptions for Oxycontin, Roxicodone, Percocet 5, Klonipin, Seroquel and Lyrica, all of which she takes daily, and some twice daily. She also testified that she hates alcohol, but that if she runs out of her pain medication she sometimes takes a drink in order to sleep. Mother also denied that she was abusing her pain medication, and she testified that her fiancé, with whom she had been living since 2006, kept her pills in a safe and doled then out to her only in the amounts indicated by her prescription.

Mother was asked about the allegations that she had refused to believe that Father had sexually abused the child. She responded that Father had told her that he passed a lie

detector test, that she had known him since she was nineteen, and that she found it hard to believe that he was capable of such acts. She added that after listening to the testimony of Dr. Monroe, she finally believed those allegations were true. Under cross-examination, she admitted that she fell asleep during part of Dr. Monroe's testimony, but explained that she only got two hours of sleep the previous night and that her medication made her sleepy if she had to sit in one place for a long time.

The trial court filed an Order of Termination on July 27, 2009. The order thoroughly summarized the trial testimony, then set out the court's findings of fact and conclusions of law. The court stated that it found by clear and convincing evidence that grounds existed for termination of the rights of both parents. The cited grounds were abandonment by reason of willfully failing to support and willfully failing to visit the child in the four months immediately prior to the filing of the petition for termination, Tenn. Code Ann. § 36-1-102(1)(A)(i), and the persistence of conditions which would be likely to subject the child to further abuse or neglect and which, therefore, prevent the child's safe return to the parent, Tenn. Code Ann. § 36-1-113(g)(3).

The court also recited each of the factors set out by our legislature in Tenn. Code Ann. § 36-1-113(i) for determining a child's best interest. It applied those factors to the evidence it heard and concluded that there was clear and convincing evidence that it was in the best interest of the child that her parents' rights be terminated. Only Mother appealed the court's order.

### III. STANDARDS FOR TERMINATION OF PARENTAL RIGHTS

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois,* 405 U.S. 645, 651 (1972); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007), *cert. den.*, 168 L.Ed.2d 729 (2007). However, that right is not absolute and may be terminated in certain circumstances. *Santosky v. Kramer,* 455 U.S. 745, 753-54 (1982); *State Dep't of Children's Services v. C.H.K.*, 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004). Terminating parental rights has the legal effect of reducing the parent to the role of a complete stranger and of severing forever all legal rights and obligations of the parent and of the child; the parent shall have no right thereafter to have any relationship, legal or otherwise, with the child. Tenn. Code Ann. § 36-1-113(*l*)(1).

The statutes on termination of parental rights provide the only authority for a court to terminate a parent's rights. *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004); *In re Tiffany B.*, 228 S.W.3d 148, 155 (Tenn. Ct. App. 2007). Thus, parental rights may be terminated only where a statutorily defined ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct.

App. 1998). To support the termination of parental rights, only one ground need be proved, so long as it is proved by clear and convincing evidence. *In the Matter of D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003).

Because the decision to terminate parental rights affects fundamental constitutional rights and carries grave consequences, courts must apply a higher standard of proof when adjudicating termination cases. A court may terminate a person's parental rights only if (1) the existence of at least one statutory ground is proved by clear and convincing evidence and (2) it is shown, also by clear and convincing evidence, that termination of the parent's rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 808-09; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "This heightened standard . . . serves to prevent the unwarranted termination or interference with the biological parents' rights to their children." *In re M.W.A.*, 980 S.W.2d at 622. Due to the significance of the consequences, courts must apply individualized decision-making to a termination decision. *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999); *In re Tiffany B.*, 228 S.W.3d at 156.

In order to be clear and convincing, evidence must eliminate any serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546 (citing *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Such evidence should produce in the fact-finder's mind a firm belief or conviction as to the truth of the allegations sought to be established. *In re M.L.P.*, 228 S.W.3d 139, 143 (Tenn. Ct. App. 2007); *In re Georgianna H.*, 205 S.W.3d 508, 516 (Tenn. Ct. App. 2006). In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is "highly probable" as opposed to merely "more probable" than not. *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005) The burden is on the party seeking to terminate parental rights to present clear and convincing evidence that grounds exist and that termination would serve the best interests of the children. *In re Valentine*, 79 S.W.3d at 546 (quoting *Hodges v. S.C. Toof & Co.*, 833 S.W.2d at 901 n.3.)

## IV. PERSISTENCE OF CONDITIONS

One ground on which the trial court based the termination of Mother's parental rights is one that is often called "persistence of conditions." *See In re Audrey S.,* 182 S.W.3d 838 at 859. It is set out in Tenn. Code Ann. § 36-1-113(g)(3) as follows:

The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
(A) The conditions that led to the child's removal or other conditions that in all

reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

At the time of the termination hearing in the present case, the child had been removed from Mother's home by court order for over three years, far more than the six month requirement set out in the statute. Mother argues that the ground of persistence of conditions does not apply to her because she has corrected the conditions that led to the child's removal by divorcing Father and moving in with her fiancé. We note, however, that Tenn. Code Ann. § 36-1-113(g)(3)(A) specifies that the ground of persistence of conditions does not apply only to those conditions that directly led to the child's removal but also to "other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect. . ." *See In re Audrey S.,* 182 S.W.3d 838 at 872.

In any case, Mother points out that she now lives in a home without the dreadful environmental conditions which Aunt witnessed in her home with Father. Mother has been sharing a one bedroom duplex with her fiancé for three years. The duplex is owned by the fiancé's Mother. While there is no evidence that it is unsanitary or poorly maintained, it is across the street from a biker bar, and there is an unfenced cliff extending from the back yard down to the river. Mother admitted that it would not be an appropriate place to raise a child. She stated that if the court allowed the child to stay with her, she and her fiancé would have to move to more suitable quarters.

A major factor contributing to the removal of the child was Mother's addiction to pain medication. Unfortunately, Mother is still addicted, and there is no proof that she has sought any treatment for the underlying medical condition that she claims has caused her to be so dependent on medication. Mother attempts to mitigate the impact of her lack of progress by claiming that she met the requirements of the plan of action which the trial court ordered her to comply with, including taking a mental health evaluation, undergoing an alcohol and drug assessment and taking parenting classes.

The proof showed, however, that although the plan of action was ordered in 2006, the only mental health evaluation Mother underwent was her 2008 Social Security evaluation for the purpose of obtaining disability status. Under questioning, she stated that she thought that

the one evaluation would "kill two birds with one stone." However, the plan of action required Mother to follow the recommendations resulting from her mental health evaluation, so she could "learn to deal with her emotional issues and live a healthy life style with her child." Since a Social Security disability evaluation is not conducted with a therapeutic focus, it does not result in the kind of recommendations that the plan contemplated.

Mother also claimed that in 2006 she underwent a seven-day alcohol and drug assessment at the Elam Center, but she admitted that she did not seek any further professional help or treatment for her problems, even though her addiction continues unabated. The proof showed that if Mother does not have her pain medication, she can not function, that her fiancé has to dole the medication out to her to keep her from overdosing, and that when she is medicated she tends to be sleepy and/or unfocused.

Further, although Mother's current living arrangement appears to be an improvement over the conditions she tolerated when she was married to Father, there are signs that any sort of return of the child to Mother's care remains problematic. A police report in the record shows that in October of 2007, Mother's fiancé was arrested after he got drunk and assaulted her. He spent five days in jail, but Mother refused to prosecute or to obtain an order of protection. Although only one such incident was testified to, Mother's willingness to tolerate abuse by her fiancé is especially disturbing in light of the fact that she turned a blind eye to Father's abuse of her child for so long.

Mother also presented disturbing testimony to the effect that she and her fiancé have occasionally allowed Father to stay with them, and Mother admitted that she has been in frequent contact with him. Mother insists that she is only trying to be charitable to Father, who is homeless. While that may very well be true, the court can not lightly ignore the possibility that if Haven A. B. were returned to Mother's care, the child might once again be exposed to the man who sexually abused her. Additionally, the fiancé admitted that he kept pornographic materials at home, and that he goes to adult bookstores from time to time to buy such materials, stating that he went "only four, five times in the last nine months to a year."

In sum, while some of the adverse conditions that led to the removal of the child from the home of her parents have been reduced or eliminated, there appears to be little likelihood that conditions which prevent the child's safe return to Mother's care can be remedied at any time in the near future. The child has been flourishing in the safe and stable environment provided by Aunt and Uncle, but the continuation of her relationship with Mother greatly diminishes her chance to achieve permanence and to be fully integrated into a safe, stable and permanent home. We, therefore, affirm the trial court's determination that there is clear and convincing evidence of the ground of persistence of conditions.

Because only one ground must be proved, so long as it is proved by clear and convincing evidence, for a court to terminate a parent's rights, we need not consider the ground of abandonment, which was also found to exist by the trial court.

## V. BEST INTEREST

Once a ground for termination is proved by clear and convincing evidence, the next inquiry for the trial court is whether termination of a parent's rights is in the best interest of the child, which also must be proved by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c)(2); *In re Valentine,* 79 S.W.3d 539, 546 (Tenn. 2002).

The statute sets out a list of non-exclusive factors for the court to consider in making its determination of best interest:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i).

The trial court found that all the above factors applied and determined that termination of both parents' parental rights was in the child's best interest. A few of them stand out as particularly pertinent for our analysis of Mother's rights, and are set our below:

(1) Although Mother has improved the physical conditions of her home, the proof shows that she has not yet made such adjustments of circumstance or conduct as would make it safe for the child to be there with her.

(2) Mother's failure to even begin to come to terms with her addiction to prescription drugs makes it unlikely that lasting adjustments will occur in the near future.

(5) The child has adjusted well to life in the home of Aunt and Uncle and is doing well in school. Dr. Monroe testified that because of Mother's persistent refusal to believe that Father sexually abused the child, the child's removal from that environment, even for the limited purpose of visitation with Mother, would have a negative effect on her emotional and psychological condition.

(6) There is no proof that Mother or her fiancé ever abused the child. But it is undisputed that the fiancé assaulted Mother on at least one occasion. The proof also showed that Father sexually abused the child many times. Although Father no longer resides with Mother, she remains in close contact with him, and he sometimes stays overnight at her home.

(7) It is undisputed that Mother can not function effectively without taking her pain medication. When she takes that medication she becomes sleepy. Thus, Mother's use of controlled substances renders her consistently unable to safely care for the child.

(8) The court did not find there to be sufficient proof as to Mother's mental or emotional status. It did find, however, that there was clear and convincing proof that Mother attempted suicide and that she failed to protect the child from sexual abuse. We affirm that finding.

(9) Mother has failed to regularly pay the child support ordered by the trial court.

Mother responds by asserting that she has a meaningful mother-daughter bond with her child. She notes that despite some missed visitations, Donna P. testified that she and the child have good interaction during visits. She also contends that she failed to pay child support only because she was unable to do so. Mother states that "I love my child and she means everything to me. . ."

We do not doubt the importance to Mother of her relationship to her daughter. However, once a ground for termination has been established, the interests of the parent and the child diverge, and the courts are then directed to give paramount consideration to the best interest of the child. *In re Giorgianna H.*, 205 S.W.3d 508, 522 (Tenn. Ct. App. 2006); *In re Audrey S.,* 182 S.W.3d 838 at 877.

. . . the question of best interest primarily involves the rights of the child. The question of the parent's rights is relevant during this phase of the court's inquiry only to the extent that it impacts the child's best interest. When the interests of the child and the parents diverge, the best interests of the child must prevail.

*In re M.H.*, No. M2005-00117-COA-R3-PT, 2005 WL 3273073 at *10 (Tenn. Ct. App. Dec. 2, 2000) (no Tenn. R. App. P. 11 application filed) (citing *In re H.A.L.*, No. M2005-00045-COA-R3-PT, 2005 WL 954866, at *9 (Tenn. Ct. App. April 25, 2005) (No Tenn. R. App. P. 11 application filed)).

The evidence in this case shows that the child's feelings about Mother are divided. She has stated that she does love Mother, but because of Mother's failure to protect her from sexual abuse and Mother's unwillingness to believe the child's account of that abuse, she does not trust Mother to keep her safe. Dr. Monroe testified that the prospect of a possible return to Mother's care is deeply unsettling to the child and keeps her from fully healing from the neglect and abuse she has suffered. We have reviewed the entire record, and we find clear and convincing evidence that it is in Haven A. B.'s best interest that Mother's parental rights be terminated. We accordingly affirm the trial court.

## VI.

We affirm the termination of Mother's parental rights on the ground of persistence of conditions. We remand this case to the Juvenile Court of Davidson County for any further proceedings necessary. Tax the costs on appeal to the appellant, Angela B.


_____
PATRICIA J. COTTRELL, JUDGE